[Civ. No. 26628. Second Dist., Div. Four. July 25, 1963.]

WILLIAM JAMES HANLEY, Plaintiff and Respondent, v. ROBERT H. LUND, Defendant and Appellant.

John R. Brunner for Defendant and Appellant.

Wise, Kilpatrick & Clayton and Robert J. Kilpatrick for Plaintiff and Respondent.

KINGSLEY, J.—Defendant Robert H. Lund, an attorney, appeals from a judgment entered on a verdict in plaintiff's favor in the latter's action for slander.

Plaintiff is a medical doctor who specializes in pediatrics. He is actively engaged in practice in Bellflower, California, and draws his patients almost entirely from Bellflower and the surrounding communities. Until June of 1956 plaintiff was the personal physician of Gale Osborn, Jr., a minor. In June 1956 plaintiff suggested to the minor's parents that the child be hospitalized at the City of Hope. The child was then referred by the City of Hope to the Children's Hospital. The child died in December 1957. After the death of the child, the parents retained defendant as their attorney, and defendant filed suit against plaintiff, among others. The suit charged that the defendants therein had negligently diagnosed and treated the child, which negligence resulted in its death. It is not now contended that plaintiff was guilty of the alleged negligence nor that the defamatory statements made about him and set forth in footnote 1 were true.

Don Maddock, a reporter for Twin Coast Newspapers, became curious when the negligence action was filed, and telephoned the law offices of defendant for further information pertaining to the malpractice suit filed against plaintiff. Such information was given to Maddock. On April 17, 1958, an article, authored by Maddock, was published in the Long Beach Press-Telegram, a newspaper circulated in Bellflower

638

and surrounding communities.[1]  The first two paragraphs of the article were merely a repetition of the allegations of the malpractice complaint.  However, the statements in the third and fourth paragraphs of the article were not taken from the malpractice complaint, and it is alleged that the sting of the libel and slander lies in the impact those statements, including their implications, gave to the article.[2]

On or about April 21, 1958, plaintiff caused to be served upon Twin Coast Newspapers, Inc., his demand for correction pursuant to section 48a of the Civil Code, setting forth respects in which the newspaper item was claimed to be libelous. At this time, George Johnson, attorney for Twin Coast Newspapers, Inc., inquired of defendant whether the facts as set forth in the article were true.  The defendant assured Johnson that they were.  Defendant later repeated this assurance in correspondence with Johnson.

On April 10, 1959, plaintiff filed a libel and slander action against defendant and Twin Coast Newspapers.  After trial, the jury returned a verdict in favor of plaintiff for $15,000 general damages[3] and $5,000 punitive damages. From judgment entered on this verdict, defendant appeals.

I

■ Defendant, relying on Code of Civil Procedure section 581a, asserts that the trial court lacked jurisdiction to hear the case because summons was not issued until more than one year after the complaint was filed and therefore that this action must be dismissed.  The point is not properly before us.

----

[1] "ASK $100,000 IN BELLFLOWER BOY'S DEATH

"A $100,000 wrongful death suit against two hospitals and a Bellflower pediatrician was filed in Superior Court Tuesday.

"Gale E. and Karie M. Osborn, 13708 Ardis Ave., Bellflower, alleged Dr. William J. Hanley, Bellwood General Hospital of Bellflower and Los Angeles Children's Hospital were negligent in diagnosing and treating their 3-year-old son, Gale E. Osborn.

"Plaintiff's attorney, Robert H. Lund, said the parents took the boy to Dr. Osborn [sic] in June 1956 to check his sore stomach and were told there was nothing wrong with him.

"Lund said the boy in fact had a ruptured bladder, which caused his death in Children's Hospital Dec. 8, 1957.''

[2] The alleged slander lies in the purported statements defendant made to Maddock in gathering information for this article.

[3] The verdict, as entered, was in the following form: "We, the jury in the above entitled action find for the plaintiff, WILLIAM JAMES HANLEY, and against the defendant, ROBERT H. LUND, and assess general damages in the sum of $15,000.00, and punitive damages in the sum of $5,000.00. 1,500.00 to be deducted from the 15,000.00'' The italicized words and figures are inserted in ink in the printed and typewritten form given to the jury; we discuss later the problem created by the insertion of the last language.

A motion to dismiss on this ground was denied by the trial court. Defendant then made application to this court for a writ of mandate to require the superior court to dismiss the action. Division Two of this court denied the petition and sent counsel for the parties a memorandum of its reasons for such denial, which indicates the matter was decided on the merits. Defendant then petitioned the Supreme Court for a hearing, and his petition was denied. This being so, it is now the law of the case.[4] (*Pigeon Point Ranch, Inc.* v. *Perot* (1963) 59 Cal.2d 227 [28 Cal.Rptr. 865, 379 P.2d 321].) Appellant argues that we are not entitled to take judicial notice of the memorandum. However, disregarding the memorandum the same result follows. Here, as in the *Pigeon Point* case, the only possible basis for action on the petition for mandate was on its merits.

## II

At the time of trial, the court granted plaintiff's motion to file a written amendment to his complaint. Defendant alleges this to be error in that, he contends, for the first time, an entirely new and distinct wrongful act was allowed to be pleaded. However, the amendment did not allege a new tort, but merely added additional facts from which malice, as alleged in the original complaint, might be inferred.[5]

---

[4]The parties discuss whether or not the rule is that of res judicata or of the law of the case. In the present context, we need not decide the semantic issue.

[5]The original paragraph 4 of the second cause of action of the complaint read as follows:

"4. The statements made by defendant, Robert H. Lund, orally and by publication in The Long Beach Press Telegram, concerning plaintiff were false and defamatory, and were made maliciously and with knowledge by said defendant of their falsity, and by means thereof plaintiff has been and is greatly injured and prejudiced in his reputation and has also lost and been deprived of gains and profits which would otherwise have arisen and accrued to him in his said profession and business, to his damage in the sum of $100,000.00 actual damages and $100,000.00 exemplary damages."

The amended paragraph 4 read as follows:

"4. Said publication was false and defamatory, and defendant Lund published each and all of said statements falsely and maliciously and with intent to injure, disgrace, and defame plaintiff and to expose him to hatred, contempt, ridicule, and obloquy; published each and all of said statements with knowledge of their falsity, without an honest belief in their truth, and without reasonable grounds for believing them to be true; and subsequent to service of plaintiff's demand for correction hereinbefore alleged, republished and reaffirmed said statements. As a proximate result of the acts of defendant Lund as aforesaid, plaintiff has been injured, disgraced, and defamed, exposed to hatred, contempt, ridicule, and obloquy, and deprived of gains and profits which would

640

■ California Code of Civil Procedure section 473 expressly authorizes the trial court, in its "discretion," to allow amendments "in furtherance of justice." The policy of great liberality in permitting amendments at any stage of the proceeding was declared at an early date and has been repeatedly restated. (2 Witkin, Cal. Procedure, § 594, p. 1605, and cases cited therein.) ■ We find no error in allowing the amendment.

### III

■ On numerous occasions during the course of trial, testimony was admitted into evidence as to the codefendant Twin Coast Newspapers, Inc., only, and not as to defendant. On the tenth day of trial, plaintiff entered into a settlement with the newspaper, and dismissed the action as to it. Defendant then moved to have stricken the testimony of Lillian King, William Turner, George Johnson, and Don Maddock. This motion was denied. The defendant claims this was prejudicial error. We do not agree. The testimony of King and Turner was relevant on the issue of damages sustained by the plaintiff. Maddock's and Johnson's testimony was concerned with the issue of whether or not the statements to the reporter resulted in publication of the newspaper article as it finally was printed and with defendant's reaffirmation of the false statements. This, too, was relevant to the issue of damages sustained by plaintiff and to the issue of malice.

■ Furthermore, the trial court invited defendant to specify any portions of the above testimony which were inadmissible hearsay as to defendant. This defendant failed to do. He cannot now be heard to complain. (*Estate of Sproston* (1935) 4 Cal.2d 717, 723 [52 P.2d 924]; *People* v. *Moore* (1947) 81 Cal.App.2d 799 [185 P.2d 32]; *Mercantile Trust Co.* v. *Sunset etc. Co.* (1917) 176 Cal. 461 [168 P. 1037].)

■ Defendant also claims that certain of plaintiff's exhibits, which originally were admitted only against Twin Coast Newspapers, Inc., should have been stricken from the record after plaintiff's settlement with the newspaper. Defendant cannot now urge this point. He waived any objection as to the admissibility of these exhibits by himself offering them into evidence at the conclusion of the trial.[6] Defendant urges

have accrued to him in his profession, all to his damage in the sum of $100,000.00 actual damages and $100,000.00 exemplary damages."

[6] The colloquy between the trial judge, Mr. King (attorney for defendant), and Mr. Kilpatrick (attorney for plaintiff) on this point is as follows:

that this discussion related only to certain exhibits offered in connection with the last witness to testify, and points to later language in which the trial judge ordered that exhibits having a number for identification only be given those same numbers as exhibits. We cannot read the discussion as referring to anything less than the total of unadmitted exhibits. The order as to numbering is without significance; since the exhibits herein in question already had numbers, an order as to numbers was necessary only as to exhibits not already admitted for any purpose.

## IV

Defendant also alleges prejudicial error in the order, meaning, content and accuracy of certain jury instructions.

■ First, defendant contends that, although the court properly instructed the jury as to the liability of a principal to respond in general damages for the authorized acts of his agents, it was error to have an instruction on a principal's liability for punitive damages separated from this instruction by some twenty instructions on various unrelated topics.

We do not regard this as error. It is well settled that instructions must be considered as a whole and in connection with each other. One instruction is not to be segregated from the group for the purpose of microscopically critical appraisal. (*Shehtanian* v. *Kenny* (1958) 156 Cal.App.2d 576 [319 P.2d 699].)

■ Second, defendant complains that the court prejudiced him in allowing an instruction on the demand for correction, which instruction pertained only to the newspaper, and had lost any value it may have possessed when the former defendant departed the lawsuit and the libel action was dismissed.

We do not see how this instruction in any way prejudiced defendant. The court had already explained to the jury, when the libel action was settled, the distinction between the causes of action and admonished them that thereafter they were concerned only with the slander action. The instruction on the demand for correction, although unnecessary, could not have misled or prejudiced defendant in any way.

■ Third, defendant claims that the court erred in giving

"The Court: There are a lot of exhibits on both sides.
"Mr. King: I offer all exhibits.
"The Court: On both sides just a blanket order; is that agreeable?
"Mr. King: That is satisfactory, yes."
"Mr. Kilpatrick: That is fine, your honor.

instructions on both express malice or malice in fact and on implied malice. For this position defendant relies on the case of *Nova* v. *Flaherty* (1956) 145 Cal.App.2d 761 [303 P.2d 382]. However, that case involved a libel by a newspaper, an action which is governed by the special rules set forth in section 48a of the Civil Code. The present action is governed by *Childers* v. *San Jose Mercury P. & P. Co.* (1894) 105 Cal. 284 [38 P. 903, 45 Am.St.Rep. 40]; *Clark* v. *McClurg* (1932) 215 Cal. 279 [4 P.2d 149, 9 P.2d 505, 81 A.L.R. 908]; and *Davis* v. *Hearst* (1911) 160 Cal. 143 [116 P. 530]. We find no error in the instruction as given.

Fourth, defendant complains that the instruction that if the jury find for the plaintiff, they must deduct the $1,500 settlement with the newspaper, implied that, in the event of a plaintiff's verdict, that verdict must necessarily exceed the sum of $1,500, and such was implied coercion to find for plaintiff.

In *Steele* v. *Hash* (1963) 212 Cal.App.2d 1, 3 [27 Cal.Rptr. 853], one of the defendants, who was a joint tortfeasor, settled with the plaintiff; the other defendant did not so settle. The plaintiff contended that it was prejudicial error to tell the jury that plaintiff had given a release to one tortfeasor in consideration of a specific sum of money. The plaintiff also contended that the proper procedure is for the court to withhold evidence of prior payments from the jury, allow them to arrive at a verdict, and thereafter reduce that verdict by the amount of the payments previously made to plaintiff. The court held these positions to be untenable.

Although the facts of the *Steele* case are distinguishable, the point of law involved is similar. The same procedure was followed in the case at bar as was held to be proper in *Steele*. Furthermore, in this case as in *Steele,* the jury was specifically instructed that they were to resolve the issue of defendant's liability prior to determining the amount, if any, of defendant's liability. We find no merit in defendant's contention that he was prejudiced by the above instruction.

Fifth, the defendant urges that he was prejudiced by reason of the court's failing to give instructions defining the words ''libel,'' and ''privileged.'' We find no merit with this contention. At the time the newspaper settled with the plaintiff, the court stated to the jury: ''Slander is oral statements; where libel is printed or written statements. The printed or written statements are out as an issue in this

case.'' From this it appears that the jury had before it an adequate definition of libel. ■ Furthermore, failure of the court to define certain terms or meaning of words cannot be complained of for the first time on appeal, in the absence of any request for a definition of such terms or for an instruction as to the meaning of such words. (*O'Connor* v. *United Railroads* (1914) 168 Cal. 43 [141 P. 809]; *Bruce* v. *Western Pipe & Steel Co.* (1917) 177 Cal. 25 [169 P. 660].)

## V

■ The verdict, as originally returned by the jury, awarded plaintiff $15,000 as general damages. After a colloquy between the trial judge and the foreman, the verdict was amended by adding the following: ''1,500.00 to be deducted from the 15,000.00.''[7] Defendant claims that this showed that the jury was confused and did not arrive at a fair verdict. The record does not support this contention. The court questioned the jury as to whether this was the net verdict or the gross verdict from which $1,500 settlement was to be deducted. The jury clearly and intelligently responded that this was the gross verdict from which the $1,500 settlement was to be deducted. To have sent the jury out for further deliberations, as defendant urges, would have been a vain and empty act which would have accomplished nothing.[8] We can find no error with the procedure followed by the trial court in this regard.

## VI

■ Defendant further complains that there is no evidence that the publication of the alleged defamatory news article was brought about by any conduct on the part of defendant, excepting, of course, that he did initiate a judicial proceeding on behalf of his clients, which was privileged. Therefore, he urges, the evidence as a matter of law was insufficient to sustain the verdict. A review of the reporter's transcript indicates substantial evidence to support the verdict and dispels any claim that there was no evidence to reasonably conclude that defendant[9] gave Maddock the infor-

---

[7]The verdict, in full, is set out in footnote 3 of this opinion.

[8]We note that plaintiff's counsel suggested the use of a form of verdict which would have spelled out the gross amount of general damages, the deduction and the net general damages. Counsel for defendant rejected the suggestion, feeling (as did the trial judge) that it was unnecessary. Defendant cannot now complain of confusion which he invited.

[9]It is not contended that defendant was not, under the evidence and instructions, liable for statements made to Maddock by his employees.

mation contained in paragraphs 3 and 4 of the news article.[10]

## VII

In addition, defendant contends that the award of general damages was excessive and that, in fact there was no evidentiary support for a finding that plaintiff suffered any damages whatever. However, the "second cause of action" upon which the jury returned a verdict in favor of plaintiff was one for slander. Where, as here, slanderous statements injure one with respect to his office, profession, trade or business (Civ. Code, § 46, subd. 3) they are deemed slander per se. (*Washer* v. *Bank of America* (1943) 21 Cal. 2d 822 [136 P.2d 297, 155 A.L.R. 1338].) Therefore, there need not have been any evidence of actual damages

---

[10]A brief sampling of pertinent testimony follows:

Don Maddock testified as follows:

"Q. Was it your customary procedure to attribute the statements in whatever article you published regarding any Complaints from Mr. Lund's office to Mr. Lund himself?

"A. It was.

"Q. Regardless of whether he or one of his employees gave it to you?

"A. It was.

"Q. During the period of time that this custom of yours was in effect had Mr. Lund told you that whoever gave you the information from his office you were to attribute to him?

"A. Yes.

". . . . . . . . . . . . .

"Q. Now you told us yesterday that what you were interested in when you made the call is the what, where, when, why and who of the general allegations of the Complaint.

"I take it then you asked either Mr. Lund or one of his employees how the doctor was negligent?

"A. Yes, sir.

"Q. The information that appears in the third and fourth paragraphs of the article is the answer that you were given?

"A. Yes, sir."

Defendant corroborated Maddock's testimony as to this custom:

"Q. You heard Mr. Maddock testify to the custom and procedure he had for calling your and either getting information directly from you or from somebody else in your office.

"A. I heard that.

"Q. Is that substantially correct?

"A. I think so, yes.

"Q. Was it correct also that you had instructed him to attribute any statements to you?

"A. In substance, yes."

Johnson testified as follows concerning his recollection of a telephone conversation with defendant concerning the news article:

"I called Mr. Lund, told him of my interest in the matter, and asked him what the facts of the case were. Perhaps I read him the story. I don't recall.

"He categorically assured me that the newspaper story as written was true and correct in all details, and actually that is all I can recall at the present time as to any details. I didn't go into it point by point with Mr. Lund."

to support an award of compensatory damages. (See *Di Giorgio Fruit Corp.* v. *American Federation of Labor & C.I.O.* (1963) 215 Cal.App.2d 560, 577 [30 Cal.Rptr. 350].)

However, we believe that the evidence showed that plaintiff suffered actual damages. At least one patient stopped going to plaintiff because of the newspaper article, and some of his colleagues questioned him on the child's death. This evidence supports a finding that serious doubt was cast on plaintiff's professional ability and reputation. In light of this evidence we do not believe that the award of general damages was excessive.

### VIII

Defendant also contends that there was no evidence of malice to sustain an award of punitive damages. As we have pointed out above, the jury was correctly instructed that they could infer malice from ''the making of later statements reaffirming that the charges were true.'' The evidence that defendant told George Johnson that the third and fourth paragraphs of the article were true, justifies the conclusion of the jury both that defendant made the original statements to Don Maddock, and that he acted with malice when he repeated them to George Johnson.

### IX

Finally defendant argues that plaintiff was *required* to show defendant's wealth in seeking exemplary damages. However, defendant has cited no authority, and our research has uncovered none, directly in support of this position. The one case strongly relied on by defendant as inferentially supporting his position is *Dunaway* v. *Troutt* (1960) 232 Ark. 615 [339 S.W.2d 613]. We do not believe this decision in any way supports defendant's position. All this case holds is that, where there are two or more defendants, and the wealth of less than all is introduced into evidence, it is error to have punitive damages assessed against all defendants. The reason for this rule is that the court has no way of equitably dividing the judgment for punitive damages among the defendants.

The California cases[11] dealing with the introduction of evi-

[11]*Barkly* v. *Copeland* (1887) 74 Cal. 1 [15 P. 307, 5 Am.St.Rep. 413]; *Greenberg* v. *Western Turf Assn.* (1903) 140 Cal. 357 [15 P. 307, 5 Am. St.Rep. 413]; *Tingley* v. *Times Mirror Co.* (1907) 151 Cal. 1 [89 P. 1097]; *Marriott* v. *Williams* (1908) 152 Cal. 705 [93 P. 875, 125 Am.St. Rep. 87].

dence of defendant's wealth, when punitive damages have been assessed, are cases in which the plaintiff had introduced, or sought to introduce, evidence of defendant's wealth. The only question before the reviewing courts in these cases was the admissibility, as contrasted with the necessity, of such evidence. The parties were content to go to the jury on the implied basis that defendant's ability to pay was consistent with his occupation. He did not contend, either in the trial court or here, that in fact the award made was excessive in the light of his financial status. Since no authority, anywhere, expressly directs that the plaintiff must introduce evidence of defendant's wealth when seeking exemplary damages, we find no merit in defendant's contention in this regard.

The judgment is affirmed.

Burke, P. J., and Jefferson, J., concurred.

A petition for a rehearing was denied August 22, 1963, and appellant's petition for a hearing by the Supreme Court was denied September 18, 1963.