[No. E004350. Fourth Dist., Div Two. Nov. 13, 1990.]

PAT ROSE ASSOCIATES, Cross-complainant and Appellant, v. D. WESLEY COOMBE et al., Cross-defendants and Appellants.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts IV and V.

12

COUNSEL

Manatt, Phelps, Rothenberg & Phillips, Timothy M. Thornton, Robert E. Hinerfeld, Gail Anderson Windisch and Paul Steven Miller for Cross-complainant and Appellant.

John M. Coombe and Edward H. Horowitz for Cross-defendants and Appellants.

OPINION

**DABNEY, J.**—Cross-complainant and appellant, Pat Rose Associates (PRA), a limited partnership, sued cross-defendants and appellants, Mervyn G. Flory, Jr., D. Wesley Coombe and others not parties to this appeal, for (1) breach of a hotel lease and (2) fraud in the sale of the hotel. The jury found for PRA and awarded it compensatory and punitive damages exceeding $9 million.

Coombe and Flory contend that (1) the trial court erroneously failed to dismiss when PRA did not bring the case to trial within five years; (2) PRA elected a contract remedy before trial and was thus precluded from recovering for fraud; and (3) the jury awarded excessive damages for fraud. Coombe asserts that he is entitled to attorney's fees as the prevailing party in an action on a contract. Flory contends that (1) the award of punitive damages was excessive, and (2) evidence was improperly admitted. PRA cross-appeals, contending that if the court determines that PRA's fraud recovery is precluded by an election of remedies, then the award of contract damages was erroneous as a matter of law.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

Flory was the president of Kingsway Services, Inc. (Kingsway), and Coombe was its director and chief financial officer. Flory owned 800 shares of stock in Kingsway, and Coombe owned the remaining 200 shares of outstanding stock.[3]

This lawsuit involves a series of transactions concerning the Sands Hotel (the hotel) in Palm Springs. In December 1979, Kingsway purchased the hotel from the Sands Hotel Company for $3.2 million. The purchase price included an all-inclusive promissory note to the Sands Hotel Company, secured by a deed of trust on the hotel in the amount of $2,562,000 (the Sands note). The Sands note called for monthly payments of $21,750.

Concurrently, in a double escrow, Kingsway sold the hotel to Richard and Patricia Welze (the Welzes) for $4.9 million. The purchase price included an all-inclusive promissory note to Kingsway secured by a deed of

---

[1] We determine that the election of remedies doctrine does not apply; we therefore do not discuss PRA's provisional cross-appeal.

[2] Neither appellant challenges the sufficiency of the evidence to support the judgment. Thus, the statement of facts does not summarize all of the complex evidence from the three-week trial, except when relevant to a point raised on appeal.

[3] Kingsway was named as a cross-defendant but filed a petition for bankruptcy before trial in this matter; thus, PRA's action against Kingsway was automatically stayed.

trust on the hotel in the amount of $4,068,000 (the Kingsway note). The Kingsway note wrapped the Sands note and a $500,000 secured note from Kingsway to HVBC, Inc. (the HVBC note). The Kingsway note called for monthly payments of $33,167, including the payment on the Sands note.

Kingsway simultaneously executed a 25-year lease (the lease) to operate the hotel, with the Welzes as landlords and Kingsway as tenant. Kingsway agreed to make the monthly payment on the Kingsway note, remit $11,000 monthly to the Welzes, pay taxes and insurance premiums and maintain the buildings and grounds.

In February 1980, PRA purchased the hotel from the Welzes for $5.3 million. PRA assumed the Welzes' obligations on the Kingsway note and made a cash down payment of $1,193,722. The Welzes assigned the lease to PRA, including the right to receive the $11,000 net monthly payment. Before escrow closed, PRA obtained a certificate of tenant, in which Flory represented that the lease was not in default. PRA also obtained financial statements from Kingsway showing that Kingsway had a substantial net worth and the hotel generated sufficient income to meet the lease obligations.

Kingsway failed to make payments on the underlying notes or to make the $11,000 monthly payments to PRA. It also failed to pay property taxes and insurance premiums and to maintain the building and grounds. In June 1980, the Sands Hotel Company sued to foreclose its deed of trust in connection with the Sands note. A receiver was appointed to operate the hotel.

PRA cross-complained against Flory, Coombe and others, alleging that to induce PRA to purchase the hotel, Flory and Coombe made material misrepresentations to PRA's principal, John Lu Ym. The misrepresentations included (1) Kingsway's false promise to perform its obligations under the lease, (2) Flory's claims that he was trying to obtain a franchise in the Best Western hotel chain and that he intended to invest substantial sums to improve the quality of the rooms at the hotel and (3) Flory's and Coombe's misstatements of Kingsway's net worth and the hotel's income. PRA also alleged that Kingsway had breached the lease and that Kingsway was the alter ego of Flory and Coombe. PRA sought a cancellation of the HVBC note on the ground that Kingsway had executed the note to HVBC, a company wholly owned by Flory, without consideration.

In November 1980, PRA installed its own receiver to operate the hotel. In September 1981, the Sands Hotel Company dismissed its complaint. In June 1981, PRA removed the receiver and began operating the hotel itself.

Although PRA invested over $1 million in renovating the hotel, the hotel was still not showing a profit at the time of trial.

In May 1984, PRA obtained ex parte writs of attachment against cross-defendants. Coombe and Flory then demurred to the cross-complaint, claiming that PRA had elected a contract remedy by obtaining the writs of attachment and had thus waived its cause of action for fraud. The trial court overruled the demurrer.

Based on the monthly income it expected to receive from the hotel, PRA's principal believed at the time of its purchase that the hotel was worth more than $5 million. PRA's expert witness testified that in fact, the hotel then had a market value of only $2.5 million, excluding the value of the lease.

Following a three-week trial, the jury held Flory and Coombe jointly and severally liable for fraud damages to PRA in the amount of $2.8 million. The jury found that Flory was the alter ego of Kingsway and awarded PRA damages against Flory for breach of contract in the amount of $2,415,051 plus interest and attorney's fees. The judgment ordered the HVBC note to be canceled. Finally, the jury imposed $3 million in punitive damages against Flory. Additional facts are set forth in the discussion of the issues.

## DISCUSSION

*I. Five-year Statute.* ▇▇▇ Coombe and Flory assert that PRA's cross-complaint should have been dismissed because PRA failed to bring the case to trial within five years. (Code Civ. Proc.,[4] §§ 583.310,[5] 583.360.[6]) PRA filed its cross-complaint on November 26, 1980, and trial began on December 1, 1986. Coombe and Flory argue that the five-year statute was not tolled[7] and none of the exceptions specified in section 583.340 applies.[8]

---

[4] All statutory citations are to the Code of Civil Procedure unless otherwise indicated.

[5] Section 583.310 states, "An action shall be brought to trial within five years after the action is commenced against the defendant."

[6] Section 583.360 states, "(a) An action shall be dismissed by the court on its own motion or on motion of the defendant, after notice to the parties, if the action is not brought to trial within the time prescribed in this article. [¶] (b) The requirements of this article are mandatory and are not subject to extension, excuse or exception except as expressly provided by statute."

[7] Section 583.350 states, "If the time within which an action must be brought to trial pursuant to this article is tolled or otherwise extended pursuant to statute with the result that at the end of the period of tolling or extension less than six months remains within which the action must be brought to trial, the action shall not be dismissed pursuant to this article if the action is brought to trial within six months after the end of the period of tolling or extension."

[8] Section 583.340 states, "In computing the time within which an action must be brought to trial pursuant to this article, there shall be excluded the time during which any of the follow-

The relevant events are as follows: On April 5, 1985, the trial court, on its own motion, directed a reference to a referee to try all issues of accounts and to report findings to the trial court. On June 5, 1985, Lee Mohr was appointed as the special referee pursuant to the court's earlier order.

On August 2, 1985, PRA moved to specially set the case for trial. The trial court denied the motion on the sole ground that it had previously appointed a special referee. The court drew an analogy to section 1141.17, subdivision (b), which provides for a tolling of the statute when a case is referred to arbitration.[9]

PRA then filed a petition for writ of mandate (case No. E002482) requesting this court to compel the trial court to set the matter for trial. The petition was denied. PRA's petition for review in the Supreme Court was also denied summarily.

On December 4, 1985, Coombe and Flory moved to dismiss the case under section 583.360. Based on its earlier ruling, the trial court denied the motion. Coombe and Flory filed a petition for writ of mandate in this court (case No. E002915). The petition was denied.

In June 1986, the referee held a hearing and in July filed his findings with the trial court. The trial court approved those findings as a special verdict on September 26, 1986.

Trial began on December 1, 1986. Coombe and Flory again raised the running of the five-year statute. The trial court ruled that because of confusion over whether the special reference tolled the five-year statute and because of the unsuccessful writ petitions, PRA had demonstrated excusable delay in getting the case to trial.

Coombe and Flory now argue that the five-year statute was not tolled by the special reference, and thus the trial court erred in denying the motions to dismiss. We agree that special reference does not toll the five-year statute. When the Legislature has intended for a procedure to toll the statute, it has expressed that intention directly. (See, e.g., § 1141.17, subd. (b).) Moreover,

---

ing conditions existed: [¶] (a) The jurisdiction of the court to try the action was suspended. [¶] (b) Prosecution or trial of the action was stayed or enjoined. [¶] (c) Bringing the action to trial, for any other reason, was impossible, impracticable, or futile.

[9] Section 1141.17, subdivision (b) states, "If an action is or remains submitted to arbitration pursuant to this chapter more than four years and six months after the plaintiff has filed the action, then the time beginning on the date four years and six months after the plaintiff has filed the action and ending on the date on which a request for a de novo trial is filed under Section 1141.20 shall not be included in computing the five-year period specified in Section 583.310."

section 583.360, subdivision (b) provides that the requirements of the article are not subject to extension, excuse or exception except as expressly provided by statute. We therefore decline to imply an exception for a reference to a special master.

However, that does not mean that the trial court erred in finding the excuse of impossibility or impracticability. We defer to the trial court's finding absent an abuse of discretion. (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193].) ■ The court determines whether it is impossible, impracticable or futile to bring a case to trial ". . . in light of all the circumstances in the individual case, including the acts and conduct of the parties and the nature of the proceedings themselves. [Citations.] The critical factor in applying these exceptions to a given factual situation is whether the plaintiff exercised reasonable diligence in prosecuting his or her case." (*Moran* v. *Superior Court* (1983) 35 Cal.3d 229, 238 [197 Cal.Rptr. 546, 673 P.2d 216].)

The *Moran* court cited with approval the case of *Bennett* v. *Bennett Cement Contractors, Inc.* (1981) 125 Cal.App.3d 673, 678-679 [178 Cal.Rptr. 633]. In *Bennett* the court found that the plaintiff had exercised required diligence by taking reasonable steps to obtain a trial date and alerting the court that the end of the five-year period was approaching. (*Id.*, at pp. 678-679.)

In *Salas* v. *Sears Roebuck & Co.* (1986) 42 Cal.3d 342 [228 Cal.Rptr. 504, 721 P.2d 590], the court found that the plaintiffs had failed to file any authorities or declarations to support their motion for trial preference, and plaintiffs took no remedial action after the court denied that motion. (*Id.*, at p. 349.) Here, in contrast, PRA petitioned for writs in this court and in the Supreme Court.

■ The Law Revision Commission has instructed that in construing section 583.340, "The excuse must be liberally construed as applied to the bringing to trial requirement. This . . . is in recognition of the fact that . . . bringing a case to trial frequently may be hindered by causes beyond the plaintiff's control." (17 Cal. Law Revision Com. Rep. (1983) 905, 918; see *Dale* v. *ITT Life Ins. Corp.* (1989) 207 Cal.App.3d 495, 502 [255 Cal.Rptr. 8].)

■ Here, the court denied the motion to set the matter for trial solely because of its mistaken belief that the five-year statute was tolled. This circumstance was beyond PRA's control.

Coombe argues that PRA failed to advance the hearing on the reference. However, at the hearing on its motion to specially set, PRA's counsel

requested the court to order the reference to start in October. The court did not do so. Coombe also argues that PRA did not exercise diligence in litigating the matter earlier. The trial court necessarily found reasonable diligence when it later denied the motions to dismiss. We find no abuse of discretion and uphold the trial court's ruling. (*Denham, supra,* 2 Cal.3d at p. 564.)

*II. Election of Remedies.* PRA's cross-complaint alleged causes of action both for breach of the lease and for fraud in inducing PRA to purchase the hotel. Coombe and Flory assert that PRA elected its contract remedy when it obtained writs of attachment against their property before trial and should have been precluded from proceeding on its fraud claims. (*Ponti* v. *Farrell* (1961) 194 Cal.App.2d 676 [15 Cal.Rptr. 500].) ■ "[O]ne who has been defrauded may elect to rescind the contract or to affirm it, retain what he has received and sue for damages for fraud. [Citations.]" (*Buist* v. *C. Dudley DeVelbiss Corp.* (1960) 182 Cal.App.2d 325, 333 [6 Cal.Rptr. 259].)

■ "The doctrine [of election of remedies] applies only when the plaintiff seeks inconsistent remedies in causes of action based on the same set of facts. Election of remedies does not preclude a plaintiff from pursuing two causes of action, as breach of contract and fraud, where each action arose out of *different obligations and different operative facts.* [Citations.]" (*General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810, 828 [220 Cal.Rptr. 291].) For example, in *Baker* v. *Superior Court* (1983) 150 Cal.App.3d 140 [197 Cal.Rptr. 480] the Bakers contracted with Best Builders to remodel a duplex and later sued Best Builders and its managers, Chatham and Williams, alleging contract and fraud theories. The Bakers claimed that Chatham and Williams had induced them to contract by falsely promising that the rental units would be constructed in six months at the agreed price. Before trial, the Bakers obtained writs of attachment on Best Builders' property. (*Id.,* at pp. 143-144.) The court held that the trial court erred in applying the election of remedies doctrine, explaining, "[T]he Bakers' fraud in the inducement and breach of contract causes of action arise out of different obligations and different operative facts. Best, Chatham and Williams were obliged to deal honestly with the Bakers and to perform their contract with them. The fraud in the inducement of the remodeling contract allegedly perpetrated by Best, Chatham and Williams and Best's later breach violated those separate obligations and also involved separate acts at different points in time." (*Id.,* at p. 146.)

Likewise, in *Symcox* v. *Zuk* (1963) 221 Cal.App.2d 383 [34 Cal.Rptr. 462], the court affirmed a judgment which awarded Symcox damages on both fraud and contract actions, despite Symcox's having levied a writ of

attachment before trial. The court found that Symcox's claims for fraud in the inducement to enter a contract and breach of that same contract violated separate primary rights and would support both tort and contract remedies in the same judgment. (*Id.*, at pp. 389-390.)

Here, PRA's causes of action for fraud and breach of contract arose at different times from separate obligations and separate operative facts. The doctrine of election of remedies does not apply. (*General Ins., supra,* 174 Cal.App.3d at pp. 828-829.)

*III. Amount of Compensatory Damages.* Coombe and Flory next argue that the jury awarded excessive compensatory damages. Even though the election of remedies doctrine did not prevent PRA from proceeding to trial on both contract and fraud claims, PRA is not entitled to a windfall double recovery. ■ *"The primary object of an award of damages* in a civil action, and the fundamental principle on which it is based, are *just compensation* or indemnity for the loss or injury sustained by the complainant, *and no more* [citations]." (*Mozzetti* v. *City of Brisbane* (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751].) To determine whether PRA obtained a double recovery in this case, we first analyze the components of the separate damages awards.

*a. Fraud Damages.* The measure of damages for fraud is out-of-pocket loss.[10] The award of $2.8 million in damages for fraud presumably represented the difference between the purchase price of the hotel and the fair market value of the hotel when PRA purchased it. PRA could also have sought its lost profits as damages for fraud under Civil Code section 3343, subdivision (a)(4).

*b. Contract Damages.* The judgment included an award of about $2.4 million in damages for breach of the lease, exclusive of attorney's fees. The computation of damages for breach of a lease is governed by Civil Code section 1951.2.[11]

---

[10] Civil Code section 3343, subdivision (a) states: "One defrauded in the purchase . . . of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, *together with any additional damage arising from the particular transaction*, including any of the following:
"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .
"(4) Where the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud . . ." (Italics added.)
[11] Civil Code section 1951.2 provides: "(a) Except as otherwise provided in Section 1951.4, if a lessee of real property breaches the lease and abandons the property before the end of the

The referee computed the unpaid rent which had been earned at the time of termination of the lease as $313,093. The referee also found that PRA's "cash outlay" for the same period was $99,924. The remainder of the contract damages award apparently represents the difference between rent which would have been earned and the amount of loss which was reasonably avoided by PRA's operation of the hotel. The referee determined that as of December 31, 1982, PRA's lease damages ceased.

*c. Duplication of Damages.* Bernard Crawford, a real estate appraiser and consultant, testified as an expert witness for PRA. Crawford gave his opinion that the hotel was worth $2.5 million when PRA purchased it. Crawford based that figure primarily on his inspection of the premises and on sales prices of comparable hotels. On cross-examination, Crawford testified that he had not considered the existing lease when he appraised the value of the hotel. He stated that, by capitalizing the anticipated income from the lease, the market value of the hotel was $5 million.

■ Coombe and Flory argue that because the value of the hotel should have been based in part on the capitalized value of the lease, PRA received duplicate damages when it recovered both its out-of-pocket loss under a fraud theory and lost-profit damages under a contract theory.

Under Civil Code section 3343, PRA could have claimed both lost-profits and out-of-pocket loss under its fraud theory. (*Stout* v. *Turner* (1978) 22 Cal.3d 718, 728-730 [150 Cal.Rptr. 637, 586 P.2d 1228].) In *Hartman* v. *Shell Oil Company* (1977) 68 Cal.App.3d 240 [137 Cal.Rptr. 244] the court stated, "Civil Code section 3343 was amended in 1971. The Legislature removed all doubt concerning the recovery of loss of profits resulting from fraudulently induced property acquisition. Clearly and specifically, lost profits proximately caused are recoverable." (*Id.*, at p. 247.) The fact that PRA recovered a portion of its loss under a contract theory does not mean that the damages were duplicated.

---

term or if his right to possession is terminated by the lessor because of a breach of the lease, the lease terminates. Upon such termination, the lessor may recover from the lessee:

"(1) The worth at the time of award of the unpaid rent which had been earned at the time of termination;

"(2) The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided;

"(3) Subject to subdivision (c), the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the lessee proves could be reasonably avoided; and

"(4) Any other amount necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom.

*d. Offsets.* ■ As part of the judgment, the trial court ordered cancellation of the $500,000 HVBC note. The judgment properly provided that fraud damages were then to be offset by the amount of the HVBC note. Coombe contends that the trial court also canceled the Kingsway note, leaving only the $2,562,000 Sands note as a lien against the property, and thus PRA's damages should be reduced accordingly. In fact, the trial court ordered the original Kingsway note canceled because it had earlier ruled that the original had been lost and that a duplicate could be treated as the original for all purposes. This did not invalidate the underlying obligation. Rather, the judgment provided that *in the event the Kingsway note was later canceled,*[12] PRA's recovery for breach of contract would be diminished by the amount of Kingsway's equity in that note.

We agree that any eventual offset in cancellation of the Kingsway note should be applied to the fraud recovery. That recovery was based on the difference between the purchase price and the actual value of the hotel. If the purchase price is reduced by the cancellation of notes, PRA's fraud damages, rather than contract damages, should be reduced accordingly.

*IV., V.* *

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

*VI. Punitive Damages Award.* ■ Flory asserts that the $3 million punitive damages award was excessive. Flory first contends that the nature of his acts did not support any award of punitive damages. However, the jury finding of fraud was a sufficient basis for awarding punitive damages. (*Storage Services* v. *Oosterbaan* (1989) 214 Cal.App.3d 498, 514 [262 Cal.Rptr. 689].)

Flory next argues that the amount of the award was excessive. No evidence of his current net worth was introduced. He argues that because punitive damages must be reasonably proportionate to the defendant's wealth (*Devlin* v. *Kearney Mesa AMC/Jeep/Renault* (1984) 155 Cal.App.3d 381 [202 Cal.Rptr. 204]), the record must contain evidence of his current

---

[12]The judgment stated, "IT IS FURTHER ORDERED THAT, if and to the extent that Pat Rose Associates obtains a principal reduction in [the Kingsway note], then the amount of said principal reduction will be deemed a corresponding offset to the $2,415,051 compensatory damages awarded for breach of lease as described above; . . ."

The court was without power to order that the principal obligation be reduced because Kingsway was in bankruptcy and the action against Kingsway was stayed.

* See footnote, *ante*, page 9.

net worth to support the award. (*Dumas* v. *Stocker* (1989) 213 Cal.App.3d 1262, 1267 [262 Cal.Rptr 311].)

There is currently a split of authority among California courts as to whether evidence of a defendant's net worth is a prerequisite to an award of punitive damages. Division One of the Fourth District (*Dumas, supra,* 213 Cal.App.3d 1262) and Division Four of the First District *Storage Services, supra,* 214 Cal.App.3d 498) have held that punitive damages must be based on the defendant's net worth at the time of trial, and the plaintiff must introduce evidence of the defendant's net worth. Division Three of the Fourth District (*Fenlon* v. *Brock* (1989) 216 Cal.App.3d 1174 [265 Cal.Rptr. 324]) has stated a contrary rule: the trier of fact is entitled to consider evidence of the defendant's wealth, but is not required to do so to award punitive damages.[15]

The courts in *Dumas* and in *Storage Services* reviewed California cases in which the courts evaluated punitive damages awards, focusing on two issues. First, they noted that a stated purpose for allowing punitive damages is to punish or deter the defendant, and that to do so, the award should bear some reasonable relationship to the defendant's net worth. Second, they stated that without evidence of net worth, appellate courts cannot meaningfully review whether punitive damages are excessive.

Although such considerations are important, in our view they are not dispositive. We believe that it is unnecessary to enter the debate as to which party has the burden of producing evidence of net worth; rather, we base our decision on traditional principles of waiver of error. (*Hanley* v. *Lund* (1963) 218 Cal.App.2d 633, 645-646 [32 Cal.Rptr. 733].)

In *Hanley,* the court noted that earlier cases addressing the introduction of evidence of defendant's wealth when punitive damages were sought dealt with "the admissibility, as contrasted with the necessity, of such evidence." (*Hanley, supra,* 218 Cal.App.2d at p. 646.) The court then disposed of the defendant's argument that such evidence was required before punitive damages could be imposed, stating, "The parties were content to go to the jury on the implied basis that defendant's ability to pay was consistent with his occupation. He did not contend, either in the trial court or here, that in fact the award made was excessive in light of his financial status. Since no authority, anywhere, expressly directs that the plaintiff must introduce evi-

---

[15] The California Supreme Court has granted review in *Adams* v. *Murakami* (1990) 228 Cal.App.3d 885 [268 Cal.Rptr. 467] (review granted June 27, 1990 (S003530)) to resolve the issue whether a plaintiff or a defendant must prove a defendant's net worth to recover punitive damages.

dence of defendant's wealth when seeking exemplary damages, we find no merit in defendant's contention in this regard." (*Ibid.*)[16]

As the *Fenlon* court noted, "The defendant always has the ability to introduce evidence of his financial condition to preserve a challenge to a punitive damages award on the ground that it is excessive as a percentage of his net worth, and the defendant also has the best access to such information." (*Fenlon, supra,* 216 Cal.App.3d at p. 1182.) If the defendant does not avail itself of the opportunity to present such evidence at trial, we see no reason in law or policy to give the defendant a second bite of the apple by permitting an appeal based on the lack of evidence. The function of the appellate courts is not to foster gamesmanship. Both plaintiff and defendant must elect a strategy in the trial court relating to evidence of net worth. Even if that strategy is unsuccessful, it binds the party on review.

We hold that it is not legally necessary that either plaintiff or defendant introduce evidence of the net worth of the defendant during the trial to support an award of punitive damages. If, however, no such evidence is presented, neither party may challenge on appeal either the inadequacy or the excessiveness of a punitive damages award; without a record of net worth evidence, we could not make a meaningful determination of such issue. In other words, if a party wishes to preserve the question for appeal, evidence of net worth must be presented at trial, or error in the amount of punitive damages is waived.

Our position avoids the necessity of remanding to the trial court for further "evidentiary proceedings." In our view, the problem with such proceedings is that the jury cannot consider the defendant's net worth in a vacuum to fix an award of punitive damages on remand.  ▪  Rather, the trier of fact should consider *three* factors: the reprehensibility of the defendant's conduct, the amount which would deter such conduct in light of the defendant's financial position and the relationship of punitive damages to actual damages. (*Storage Services, supra,* 214 Cal.App.3d at p. 514.) Thus, on a remand to reevaluate punitive damages, the court would be required, in effect, to hold a second jury trial which would necessarily include substantial evidence from the earlier phase of the liability trial to

---

[16] The *Dumas* court attempted to distinguish *Hanley*; however, in our view, the attempt was unsuccessful. The *Dumas* court characterized the *Hanley* decision as arising from "peculiar and narrow circumstances" (*Dumas, supra,* 213 Cal.App.3d at p. 1268) and stated that the court "concluded there was an implicit agreement that the defendant was sufficiently wealthy to absorb the penalty . . . inferentially stipulat[ing] away the issue of net worth, rendering evidence by the plaintiff unnecessary." (*Ibid.*) We believe the *Hanley* decision clearly stood for the proposition that evidence of net worth was admissible, but not necessary. If such evidence is not presented at trial, the defendant may not attempt to show on appeal that the punitive damages assessed were disproportionate to his wealth.

show the degree of the fraud, malice or oppression. The burden on the court system, when the parties had the opportunity to present evidence of net worth at the original trial, is obvious.

In light of these principles, we find no error in the amount of the punitive damages award.

## DISPOSITION

The judgment is modified to provide that if PRA later obtains a principal reduction in the Kingsway note, the amount of the reduction will be deemed an offset to the damages awarded for fraud. As so modified, the judgment is affirmed. Each party to bear its own costs on appeal.

Hollenhorst, Acting P. J., and Timlin, J., concurred.

A petition for a rehearing was denied December 3, 1990.