[No. B114443. Second Dist., Div. Two. Feb. 16, 1999.]

WAFFER INTERNATIONAL CORPORATION, Plaintiff and Appellant,
v.
MICHAEL KHORSANDI et al., Defendants and Respondents.

**COUNSEL**

Seyfarth, Shaw, Fairweather & Geraldson, Thomas J. Weiss and Steven B. Katz for Plaintiff and Appellant.

Silverstein & Huston and Mark W. Huston for Defendants and Respondents.

**OPINION**

**ZEBROWSKI, J.**—This case concerns the defense of election of remedies in the context of attachment. The plaintiff (appellant on this appeal) obtained and levied a writ of attachment in a *related but different* case against a *corporate* defendant. The trial judge then ruled that plaintiff was barred by the election of remedies doctrine from pursuing tort remedies in *this* case against two *individual* defendants. The trial court thus granted summary judgment to the individual defendants (respondents on this appeal). In

making this ruling, the trial court relied on *Richmond Teachers Credit Union v. James F. Waters, Inc.* (1960) 182 Cal.App.2d 110 [5 Cal.Rptr. 716].

*Richmond* has never been cited in any other reported decision, possibly because its statement of facts does not correspond to the law it applied. Despite *Richmond*'s use of the word "attachment," the opinion factually describes a claim and delivery case. It is therefore off point for present purposes. Even if *Richmond* were considered an attachment case, there are significant distinctions between the attachment law in force at the time of *Richmond* and the attachment law in force now. At the time of the events in *Richmond* (the early to mid-1950's), attachment law routinely allowed a plaintiff to obtain summary seizure of a defendant's property before trial with no notice, no chance to be heard, and no prior judicial involvement. Defendants often first learned of the plaintiff's lawsuit by learning that their property had been seized. Moreover, the attachment law at that time applied to a wide variety of claims, including nonbusiness (consumer) claims. Property necessary for family maintenance was consequently often summarily seized. Attachment was therefore viewed as a harsh remedy which created significant hardship.

A parallel judicial development still ongoing at the time of *Richmond* was an expansive application of the doctrine of election of remedies designed to curtail the use of attachment and to mitigate its harshness. A decade after *Richmond*, however, the attachment law (together with many other unilateral creditor's remedies) was found unconstitutional as violative of due process. During the 1970's, a new attachment law was enacted incorporating extensive due process protections, including notice in all but extraordinary circumstances, an opportunity to be heard, strict evidentiary requirements, judicial prescreening, required findings (including findings on the merits before attachment), restriction to certain types of business claims, etc. The detailed attachment statute that now exists, consuming 50 pages in even the unannotated code and brimming with procedural protections, bears scant resemblance to the summary unilateral creditor's remedy in existence at the time of the events in *Richmond*.[1]

Even before this metamorphosis in attachment law, the more expansive applications of the election doctrine were falling into disrepute. After the metamorphosis, case law has continued the trend of narrowing the election of remedies defense in favor of deciding tort claims on their merits. The rationale for this narrowing is that the election doctrine is a form of estoppel.

---

[1] "The Attachment Law" appears at Code of Civil Procedure sections 481.010 through 493.060, consuming pages 166 through 216 in the West's 1998 Compact Edition of the Code of Civil Procedure.

The purpose of an estoppel is to remedy an inequity. Since the current attachment statutes carefully protect a defendant's rights and allow attachment only upon prior court order in limited circumstances, it is doubtful that attachment today can ever be said to result in an inequity justifying an estoppel. Instead, the election doctrine now appears simply outmoded in the attachment context due to the extensive revisions in the attachment statutes. However, even assuming that some vestige of the doctrine survives, the doctrine does not apply to the facts of this case. We will therefore reverse the summary judgment and remand for the tort claims to be adjudicated on their merits.

## I. FACTUAL BACKGROUND.

An abbreviated summary of this procedurally complex litigation:

Plaintiff Waffer International Corporation sued several defendants alleging breach of contract, negligence, fraud and conversion arising out of the shipment of $2.5 million worth of computer monitors from Taiwan, and their sale to Edison Technologies, Inc.[2] Edison is now defunct; the instant appeal concerns individual defendants Fred Anavim (Edison's controller) and Michael Khorsandi (another Edison officer) (collectively the "individual defendants"). The individual defendants were initially named in two causes of action, one for conversion and one for fraud and deceit. In these two counts, plaintiff Waffer alleged that the individual defendants caused the monitors to be wrongfully released to Edison by the international shipper without payment to Waffer.

On the day the initial complaint was filed, plaintiff applied ex parte for a right to attach order and an order for issuance of writ of attachment against purchaser Edison. The application was either denied or withdrawn in favor of an attempt at settlement. On that date at the courthouse a handwritten "stipulation for settlement" was signed by plaintiff Waffer, purchaser Edison, and the international shipper. The stipulation did not mention release of any claims against the individual defendants, did not mention any consideration to be paid by the individual defendants, and was not signed by the individual defendants. The settlement agreement provided that purchaser Edison would, on that same day, make an initial payment of $500,000. The payment was not made, and a few days later Waffer again unsuccessfully applied ex parte for a writ of attachment against purchaser Edison.

[2]Waffer is actually the assignee of the claims of Essex Monitor Co., Ltd., a Taiwanese company. However, inasmuch as the details of the assignment are immaterial to the issues presented, we simply use the designation "Waffer" to refer both to the actions of Essex before the assignment and to the actions of Waffer after the assignment.

Waffer then filed an amended complaint which, together with a supplement discussed below, is the operative pleading. Waffer alleged deliveries on a series of sales contracts, and Edison's failure to pay. Causes of action were asserted against Edison for breach of contract, goods sold and delivered, money had and received, account stated and open book account. Waffer also sued the international shipper for breach of contract and negligence for delivering the monitors without first receiving notice from Waffer that purchaser Edison had paid for them.[3] Waffer also sued the individual defendants (among others not involved here) for conversion, alleging that they converted the monitors. Finally, Waffer sued the individual defendants (also among others not involved here) for fraud, alleging that they falsely represented an intention to pay and then presented false documents to the international shipper, causing the shipper to release the monitors without payment.

Waffer then obtained issuance of an order to show cause re: preliminary injunction, and a preliminary injunction was subsequently issued. The injunction enjoined purchaser Edison "and all persons acting under, or in concert with it" from disposing of the inventory of monitors sold to Edison by Waffer.[4] Waffer also moved, pursuant to Code of Civil Procedure section 664.6, for entry of judgment on the settlement agreement noted above.[5] However, the court denied the section 664.6 motion on the ground that the settlement agreement required determination of the amount of an offset by arbitration.

Purchaser Edison, a defendant in the instant case, then commenced a separate action against Waffer and the international shipper seeking declaratory relief under the settlement agreement. In that other action, Waffer cross-complained alleging breach of the settlement agreement (this other action will be referred to as "the parallel action"). In the parallel action (in which the individual defendants involved in the instant appeal were not parties), Waffer obtained a writ of attachment on its cross-complaint against purchaser Edison in the amount of $2,475,000. However, Waffer was successful in levying on only about $200,000 worth of assets.

The remaining issues raised in the parallel action were arbitrated by the American Arbitration Association. The arbitrators found that purchaser Edison had breached the settlement agreement (as opposed to the underlying

---

[3]The claim against the international shipper was arbitrated; the international shipper is not a party to this appeal.

[4]Actually by Waffer's assignee, Essex.

[5]All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

contracts of sale), and awarded Waffer over $2.5 million, including interest.[6] This award was confirmed as a judgment, but Waffer has been unable to enforce it, allegedly because all of Edison's assets have disappeared.

Waffer then moved to file a supplemental complaint in the instant action. The proposed supplemental complaint alleged that after issuance of the writ of attachment against corporate purchaser Edison, the individual defendants committed further acts of conversion and fraud by transferring purchaser Edison's funds to Hong Kong, by transferring Edison's funds to themselves, by parking Edison's funds with their attorney and at other offshore sites, by diverting approximately $1 million worth of Edison's computer chips (or their proceeds), and by otherwise looting Edison and rendering it insolvent so that Waffer could not recover.[7]

While Waffer's motion for leave to file its supplemental complaint was pending, the individual defendants filed the summary judgment motion which resulted in this appeal. The summary judgment motion raised the issue considered in this opinion: It contended that Waffer had forfeited its tort claims for conversion and fraud against the individual defendants in this action by pursuing its attachment remedies on its settlement contract claim against the corporate defendant in the parallel action.

After the individual defendants filed their summary judgment motion, the trial court granted Waffer's motion to file its supplemental complaint. Waffer then filed opposition to the summary judgment motion, in part pointing out that the individual defendants had not addressed the claims in the supplemental complaint. After allowing additional briefing, the trial court granted the individual defendants' motion for summary judgment on the grounds that Waffer's act of obtaining and levying a writ of attachment against Edison in the parallel action constituted an election of remedies

---

[6]The arbitrators also found in favor of the international shipper on Waffer's claim for wrongful delivery of the monitors. The superior court confirmed the award, and we affirmed in an unpublished opinion.

[7]One claim in Waffer's supplemental complaint was that the Edison assets allegedly converted by the individual defendants were subject to an attachment lien in favor of Waffer. However, Waffer did not allege how Waffer's attachment lien had been created. An attachment lien is normally created by a levy. (§ 488.500, subd. (a); but see also § 486.110, subd. (a) [creation of lien by temporary protective order]; § 491.110, subd. (c) [creation of lien by order to appear]; § 491.190, subd. (a) [creation of lien by order after examination of third person].) Waffer claims that it was unable to levy due to the individual defendants' conversion, diversion and concealment of Edison's assets, and has not identified how its alleged lien was created. However, the issue of the validity of Waffer's claimed attachment lien is not involved on this appeal and remains to be litigated. Involved here is only the question of whether Waffer's attachment efforts against corporate purchaser Edison has caused Waffer to forfeit its tort claims against the individual defendants who allegedly looted the corporate defendant.

which sacrificed Waffer's tort claims against the individual defendants in this action. The trial court expressly relied on *Richmond Teachers Credit Union* v. *James F. Waters, Inc., supra*, 182 Cal.App.2d 110. This appeal followed.

## II. DISCUSSION.

### A. *The election of remedies doctrine in the attachment context.*

#### 1) *Waffer is not barred from proceeding on its tort claims.*

 Waffer's act of obtaining an attachment against Edison does not bar Waffer from pursuing its tort claims against the individual defendants for several reasons. First, it is doubtful that the doctrine of election of remedies has any continuing viability in the attachment context. The cases which pioneered the application of the doctrine in the attachment context were dealing with a type of attachment law which no longer exists. Even before the old attachment law was extinguished as unconstitutional, the cases were curtailing the application of the election doctrine in the attachment context. Hardly any room, if any room at all, remains for application of the doctrine in this context. Second, even assuming that the doctrine survives in the attachment context to some degree, it nevertheless does not apply here, because Waffer's claim against Edison in the parallel action arose out of operative facts different from Waffer's claim against the individual defendants in this action. Third, again assuming that the doctrine survives in the attachment context to some degree, it nevertheless does not apply here because Waffer pursued the attachment remedy against Edison, not against the individual defendants, and the individual defendants were not legally prejudiced by Waffer's pursuit of its statutory attachment remedies.

#### 2) *The initial issue which must be addressed is the surviving extent, if any, of the election of remedies doctrine in the attachment context.*

 As briefed, this case initially presented the issue of who is entitled to assert the bar of the election of remedies doctrine in the attachment context. Lurking beneath this secondary issue, however, is the primary issue of whether *any* defendant can now repel meritorious tort claims (we must, for present purposes, assume that the tort claims are meritorious; they have never been adjudicated on their merits) simply because the plaintiff has sought an attachment order from a judge on a contract claim. (Cf. *Cedars-Sinai Medical Center* v. *Superior Court* (1998) 18 Cal.4th 1, 7 [74 Cal.Rptr.2d 248, 954 P.2d 511] [rejecting proposal that court determine proper procedures for processing first party evidence spoliation claim without first deciding whether that tort even exists; to do so would risk "a purely

academic and hypothetical decision"].) After inquiry by letter from the court, the parties discussed the current status of the election doctrine in the attachment context at oral argument. Additional authority was discussed, and no request for further written briefing was made. We thus begin by considering the underlying issue of whether the election doctrine survives at all in the attachment context. Although we cannot predict with complete accuracy unusual facts which might possibly arise, we find that it is unlikely that much, if any, room remains for the application of the election doctrine in the attachment context.

### 3) *The superseded attachment law.*

For over 100 years before the attachment law then in effect was held unconstitutional in *Randone* v. *Appellate Deptartment* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], a creditor's right to attach was essentially automatic in a wide variety of cases. (*Id.* at p. 540.) Former section 537 et seq. provided for automatic issuance of a writ of attachment by a court clerk, without judicial involvement, merely upon filing of a declaration by the plaintiff's counsel declaring that the plaintiff's claim was on a contract within the broad scope of the statute. The declaration could be filed at the same time as the complaint, and a writ of attachment automatically obtained simultaneously with the summons.[8] The issuance of the writ was a ministerial duty of the court clerk; there was no prior judicial involvement. (Cf. *Arcturus Mfg. Corp.* v. *Superior Court* (1963) 223 Cal.App.2d 187 [35 Cal.Rptr. 502] [superior court had to *issue injunction* to prevent plaintiff from automatically obtaining further writs of attachment from the clerk].) Moreover, the clerk was required by statute " 'not to make public the fact of the filing of the complaint . . . until after the return of service of the writ of attachment. . . .' " (*Randone, supra,* 5 Cal.3d at p. 544; former § 537 et seq.) Defendants thus often first learned that they had been sued by learning that their bank account, tools, car, furniture, etc., had been seized, possibly causing great hardship. Attachments were permitted on nonbusiness claims during this period, and seizure of a wide variety of property necessary for family support could result. (See *Randone, supra,* at p. 541.) *Randone,* for example, involved individual defendants who asserted that their sole source of income was unemployment insurance, yet their bank account was nevertheless seized without notice on an attachment order obtained by a lawyer seeking fees. (*Id.* at p. 542; see also *Barceloux* v. *Dow* (1959) 174 Cal.App.2d 170 [344 P.2d 41] [attorneys obtained and levied writ of attachment against widow for services rendered to husband's estate, no prior judicial involvement].) Once property was seized pursuant to a writ of

---

[8]It could also be summarily issued later according to similar procedures. (See, e.g., *Barrett* v. *Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305, 311-312 [16 Cal.Rptr. 49].)

attachment, property could conceivably be held for years while a claim was litigated. Legislative efforts to mitigate the harshness of these procedures primarily took the form of an expanding list of property exemptions (cf. *Randone, supra* at pp. 545-546), but the remedy remained harsh and oppressive nonetheless.

It was in this legal climate that courts began applying the doctrine of election of remedies to insulate defendants from tort liability if attachment remedies were pursued. These pre-*Randone* cases do not elaborate on the rationale for using the judge-made election doctrine to qualify a statutory right. Instead, they merely state the rule in conclusory terms, specifying that the election of remedies doctrine is a form of estoppel which applies when a plaintiff pursues "inconsistent" remedies by which the plaintiff "gains an advantage" over the defendant or "interferes" with the defendant's use of property. (See, e.g., *Steiner* v. *Rowley* (1950) 35 Cal.2d 713, 720 [221 P.2d 9] [". . . the doctrine of election of remedies is based upon the principle of estoppel"; doctrine applies where "inconsistent" remedies are sought whereby plaintiff gains an advantage over defendant]; *Roam* v. *Koop* (1974) 41 Cal.App.3d 1035 [116 Cal.Rptr. 539] [same; also decided pursuant to pre-*Randone* law]; *Barrett* v. *Hammer Builders, Inc., supra,* 195 Cal.App.2d 305, 316 [levy of attachment "interfered with defendants' possession of their property" and "[d]efendants were deprived of the use of their money"].)[9] Thus the courts created a judicial limitation on the exercise of a statutory right, prohibiting the pursuit of tort claims if a litigant chose to invoke the statutory attachment remedy. The apparent motivation was the judicial perception that the attachment remedy was overly harsh, a view that was ultimately confirmed when the attachment law was declared unconstitutional, as discussed below. (Cf. *Barceloux* v. *Dow, supra,* 174 Cal.App.2d at p. 174 [". . . attachment is a harsh remedy at best in that an alleged debtor loses control of his property before the claim against him has been adjudicated"]; *Arcturus Mfg. Corp.* v. *Superior Court, supra,* 223 Cal.App.2d at p. 195 [". . . attachment is a harsh remedy in that it subjects the alleged debtor to a deprivation of his property prior to an adjudication on the merits"].)

---

[9]Similar observations could often be made regarding the effect of an injunction, but no authority has been cited or found providing that a plaintiff is barred from pursuing tort claims simply because the plaintiff earlier obtained an injunction. The historically different treatment of the two situations—attachment and injunction—may have resulted from the fact that injunctions have always been issued only by judges after judicial review, and have never been issued (as was the case with writs of attachment in the pre-*Randone* period) ministerially by clerks without judicial review. (See also § 482.020 [nothing in the Attachment Law precludes injunctive relief]; Cal. Law Revision Com. com., 15A West's Ann. Code Civ. Proc. (1979 ed.) foll. § 482.020, p. 18 ["The remedies provided by this title are not intended to be exclusive."].)

*4) The Richmond case relied upon by the individual defendants does not support their claim of election of remedies.*

 The individual defendants rely on *Richmond Teachers Credit Union* v. *James F. Waters, Inc., supra,* 182 Cal.App.2d 110, using it primarily to support the proposition that obtaining an attachment against one defendant provides a second defendant with insulation from tort liability. *Richmond* was a pre-*Randone* case (1960) and contains typical conclusory language stating the election doctrine. However, it also has an odd factual twist. Although the case uses the language of attachment, the factual description is one of claim and delivery. Claim and delivery is a remedy by which a party with a superior right to a specific item of personal property (created, most commonly, by a contractual lien) may recover possession of that specific property before judgment. (See current § 511.010 et seq. [Claim and Delivery of Personal Property].) Attachment, by contrast, is a remedy by which a plaintiff with a contractual claim to money (not a claim to a specific item of property) may have various items of a defendant's property seized before judgment *and held by a levying officer for execution after judgment.* (See current § 481.010 et seq. [containing no provision for release of attached property to plaintiff before judgment; instead attached property is held for possible execution after judgment, in the event that plaintiff succeeds in obtaining a judgment].)

 The facts stated in *Richmond* were that the plaintiff credit union held, or contended that it held, a "lien" against a car. (*Richmond Teachers Credit Union* v. *James F. Waters, Inc., supra,* 182 Cal.App.2d at p. 114.) The lien allegedly secured a promissory note given to the credit union by the car buyer to finance the purchase of the car. The credit union sued the car buyer on the promissory note, and also sued both the buyer and another party for conversion of the car (the conversion claim alone implies a claim of title to the car, in this case because of the asserted lien).[10] The opinion states that the credit union "procured the issuance of a writ of *attachment*" (*id.* at p. 113, italics added) against the buyer and had the sheriff take possession of the car. However, according to the opinion, the sheriff then *gave possession of the car to the credit union, and the credit union then sold the car before judgment.* (*Ibid.*) Later stating it a second way, the *Richmond* court stated that "the appellant . . . obtained a writ of attachment by which the chattel [the car] was reduced to possession." (*Id.* at p. 115.) *Richmond* contains no

---

[10]If title to the car had been unconditionally transferred to the buyer, with no lien retained by the credit union, there would be no basis for the credit union to claim conversion of the car. Instead, the credit union would then have only a claim on an unsecured promissory note. Thus it appears that the credit union was seeking to repossess the car based on a claim of lien, although the opinion is not completely clear.

explanation of how a plaintiff could obtain possession of a car before judgment pursuant to attachment law, although this could occur under claim and delivery law. Under attachment law, the sheriff normally would hold the car until judgment, and then the sheriff would sell it after judgment at an execution sale.[11] *Richmond* thus appears factually to be discussing a "writ of *possession*" rather than a writ of *attachment*. Writ of possession would be the proper terminology if the credit union were repossessing the car under the claim and delivery law, which could be consistent with the credit union's claim of a lien against the car.[12] *Richmond* is weak authority in view of the incompatibility between attachment law and the facts recited in *Richmond*, especially in view of the absence of any identification of what statutes were utilized in the credit union's repossession efforts.[13]

Perhaps even more important than the factual discrepancies in *Richmond*, however, is the simple fact that the issue posed in *Richmond* was quite different from the issue posed in the instant case. The question in *Richmond* was whether a credit union claiming a lien on a car to secure payment of a promissory note could first repossess and sell the car, and then also sue a third party for conversion of that same car. Once the credit union had repossessed and sold the car on which it allegedly had a lien, the credit union had received full benefit from its lien. It had no further right to sue for, and

---

[11]Under current law, if it appears that property may greatly deteriorate in value, for example because of developing obsolescence, perishability, or changing market conditions, the court can order the property sold before judgment. (§ 488.700, subd. (a).) The proceeds of such a sale, however, remain with the levying officer pending conclusion of the litigation. The plaintiff can reach those proceeds only by execution after judgment. Thus a car, if it were rapidly depreciating in value, could conceivably be sold before judgment under the current attachment law, but the plaintiff would not receive the proceeds. Instead, the plaintiff would first have to obtain judgment. Then the plaintiff could execute on whatever the defendant's assets were being held by the levying officer, including the proceeds of the car sale.

[12]Subsequent to the decision in *Richmond*, special statutes were enacted which apply to conditional sales of automobiles and repossession of cars in the event of default on such conditional sales. (See Civ. Code, § 2981 et seq. ["Automobile Sales Finance Act"].) However, even though *Richmond* appears to have involved a conditional sales contract according to which the credit union retained, or claimed that it retained, a lien against the car, the parties have provided insufficient legal archaeology to allow exact determination of what law applied to repossession of cars under conditional sales contracts at the time of the events involved in the *Richmond* decision (the early 1950's). Although the *Richmond* opinion does cite cases which discuss attachment law, *Richmond* describes a claim and delivery situation and never expressly identifies what statutes were involved in the credit union's repossession efforts. If there were no specialized statutes in the early 1950's regarding conditional sales of cars, general claim and delivery procedures would appear to have applied, and claim and delivery is what appears to have been involved in *Richmond*.

[13]If *Richmond* really were good authority for the proposition that an attachment against one defendant sacrifices meritorious tort claims against other defendants, *Richmond* would seem to be an important precedent. However, in the 38 years since its publication, *Richmond* has not been cited in any other reported decision. Possibly others have also observed its uncertainties, and this may account for its obscurity.

had not incurred damage from, any alleged conversion of the very same car it had just repossessed and sold. The third party had caused the credit union no damage if the credit union was able to repossess and sell its collateral.[14]

Even if *Richmond* (despite its facts) could be construed as involving attachment rather than claim and delivery, and even if the case were construed to support the proposition that an attachment caused an election of remedies which forfeited tort claims based on the law in force at the time of *Richmond*, that law no longer exists as a result of the ruling in *Randone*. Moreover, the election of remedies doctrine was in retreat even before *Randone*, and post-*Randone* cases have constricted it close to the vanishing point, if not to that point and beyond.

### 5) *The erosion of the election doctrine.*

In 1971, the California Supreme Court invalidated the entire attachment law in the *Randone* decision. *Randone* was based on the seminal United States Supreme Court decision in *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [89 S.Ct. 1820, 23 L.Ed.2d 349]. *Sniadach* invalidated a Wisconsin statute which allowed garnishment of wages without prior notice, finding that this was a taking of property without due process. Prior to *Sniadach*, there was no such due process authority. The previous lack of such a broad invalidating theory may account for the California judiciary's resort instead to the judge-made election doctrine to attempt to curtail the harsh effects of unilateral creditor's remedies such as attachment, which were common before *Sniadach*. Notwithstanding that each of these harsh remedies was embodied in statute, the courts nevertheless imposed judge-made qualifications or limitations on the exercise of these statutory rights. Armed with the *Sniadach* authority, however, the *Randone* court moved beyond a mere judicial limitation imposed by way of the election doctrine, and invalidated the attachment law wholesale, finding that "the prejudgment attachment procedure sanctioned by subdivision 1 of section 537 violates procedural due process as guaranteed by article I, section 13 of the California Constitution and the Fifth and Fourteenth Amendments of the United States Constitution." (*Randone* v. *Appellate Department, supra*, 5 Cal.3d at p. 541.) The lengthy and detailed opinion concludes that ". . . California's attachment statute violates this procedural due process precept by sanctioning in substantially all contract actions attachment of a debtor's property, without notice and hearing. Nor is the overbroad statute narrowly drawn to confine attachments to extraordinary circumstances which require special protection to a state or creditor interest. Given the statute's fundamental constitutional

---

[14]There was no claim that the third party had damaged the car, thus reducing its value and causing the credit union to recover less upon selling it.

infirmity, the attachment of the Randones' bank account cannot stand . . . ." (*Id.* at p. 564.)

After the demise of the attachment law in *Randone*, the Law Revision Commission undertook to formulate a wholly revised attachment statute which would satisfy constitutional due process requirements. The result of that effort, with minor amendment, is "The Attachment Law" in effect today. (§ 481.010 et seq.; see also § 482.010 [short title "The Attachment Law"].) The new law is replete with due process protections and procedures designed to avoid hardship and unfairness, including a requirement for a judicial determination that a plaintiff's claim is probably valid before a defendant's property can be levied upon. (Cf. *Sniadach* v. *Family Finance Corp.*, *supra*, 395 U.S. 337 (conc. opn. of Harlan, J.) [discussing concept of "probable validity"].) Even before *Randone*, however, and not surprisingly continuing thereafter, case law has steadily restricted the application of the election doctrine in the attachment context. It now seems apparent that the doctrine is largely outmoded in this arena.

*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101 [135 Cal.Rptr. 802] was decided post-*Randone*, but involved pre-*Randone* law insofar as election of remedies was concerned. Nevertheless, the *Glendale Federal* court construed the election of remedies defense in the attachment context as very limited. Glendale Federal was suing two individual defendants for both breach of contract and false promise fraud. Glendale Federal obtained writs of attachment on the contract claim before *Randone* was decided. After *Randone* invalidated the attachment law, the writs were vacated because no attachment law remained in effect. The individual defendants then sought to avoid a judgment on the fraud claim by contending that Glendale Federal had forfeited its fraud claim by obtaining the writs of attachment. The *Glendale Federal* court rejected this contention, stating: "The doctrine [of election of remedies] rests on the rationale that when plaintiff has pursued a remedy which is inconsistent with an alternative remedy and thereby causes the defendant substantial prejudice, plaintiff should be estopped from pursuing the alternative remedy. Here . . . the cause of action for fraud was not inconsistent with the remedy for breach of contract and the operative facts giving rise to each cause of action are different. The contract cause of action was for breach of the agreement guaranteeing completion [of a construction project] whereas the fraud cause of action was based on the false promise . . . that the loan funds would be expended solely for [that construction project]. Thus, each cause of action arose out of different obligations and different operative facts." (*Id.* at p. 137.) The *Glendale Federal* court went on to add: "Furthermore, the doctrine of election of remedies, bottomed upon the equitable principle of estoppel,

operates only where pursuit of alternative and inconsistent remedies substantially prejudices the defendant." (*Ibid.*) The court then considered the nature of the levies involved and the fact that the writs were vacated after *Randone*, and concluded that the individual defendants had suffered "no prejudice or hardship precipitated by Glendale's writs of attachment." (*Ibid.*)

*Glendale Federal* expressly relied on *Symcox* v. *Zuk* (1963) 221 Cal.App.2d 383 [34 Cal.Rptr. 462], a case which had begun the erosion of the election of remedies doctrine in the attachment context long before *Randone*. In *Symcox*, the plaintiff was suing for fraudulent inducement of a contract, for breaches of various provisions of the contract, and for breach of a separate option contract. The plaintiff obtained a writ of attachment on one of the breach of contract claims and "made some 28 levies . . . upon the real and personal property of defendants . . . ." (*Id.* at p. 388.) The defendants thereafter appealed a fraud judgment against them, arguing that the plaintiff was barred from recovering for fraud by the election doctrine. The *Symcox* court rejected this contention and distinguished prior cases applying the election doctrine, stating that "these cases are distinguishable from the case here presented since in each only one cause of action was present, pleaded in different ways under two or more theories. That is to say, only one primary right was violated and the various counts or causes of action were all directed at the vindication of that right.[15] [¶] In the present case plaintiff's first cause of action was for fraud, in that defendant by false and fraudulent representation induced plaintiff to enter into the distribution franchise agreement, thus incurring out-of-pocket expenses . . . . Plaintiff's second cause of action was for breach of the guaranty clause of the distribution franchise agreement. Plaintiff's third cause of action was for breach of this same agreement in that defendants did not furnish plaintiff with the type of merchandise described in the contract. The fourth cause of action was for breach of the refund clause of an option agreement that was wholly distinct and apart from the distributor franchise agreement . . . . [¶] It will be noted that the operative facts giving rise to each cause of action are different, and in each instance a different primary right had been violated. Therefore,

---

[15]For example, in *Steiner* v. *Rowley*, *supra*, 35 Cal.2d 713 (the Supreme Court case often cited on the subject of election of remedies and attachment) the plaintiff buyers were suing a real estate broker who represented them in connection with their purchase of real estate. Although the broker was supposed to be representing the buyers, he had allegedly taken a secret profit of $2,000 from the seller. The plaintiffs sued in four counts, each of which sought disgorgement of the secret profit. The first cause of action alleged breach of an oral contract. The second was for money had and received. The third was stated as a claim for a secret profit. The fourth and last was a fraud claim. Thus each of the four counts pleaded identical facts; they differed only in the legal characterization attached to the facts. The fourth count, for fraud, prayed for punitive damages in addition to disgorgement of the $2,000, and it was that claim for punitive damages that was found barred by the election of remedies doctrine in *Steiner*.

plaintiff's use of the provisional remedy of attachment as to one of the independent causes of action in no way amounted to an election . . . because he had independent, therefore consistent, causes of action and was entitled to pursue all of them until satisfaction was had." (*Id.* at p. 391.) Thus *Symcox* found that there was no bar by election of remedies when different rights are violated, and *Glendale Federal* followed that lead.

*Baker* v. *Superior Court* (1983) 150 Cal.App.3d 140 [197 Cal.Rptr. 480], was a post-*Randone* case applying post-*Randone* law, which also found substantial limitations on the election doctrine in the attachment context. In *Baker*, the cross-complainants (the Bakers) were suing the cross-defendant for breach of a remodeling contract, intentional and negligent infliction of emotional distress in performance of the contract, and fraud in the inducement of the contract. The Bakers obtained and levied a writ of attachment. The cross-defendant then moved for "partial summary judgment" barring the Bakers' tort claims on grounds of election of remedies. The trial court granted the motion, but the Court of Appeal issued a writ of mandate ordering denial of the motion.

The Court of Appeal stated in *Baker*: "Courts and commentators have long recognized the harshness of the election of remedies doctrine and have for some time looked upon it with disfavor. [Citations.] To mitigate the doctrine's effects, courts over the years have devised various ways of narrowing its application. . . . Forty to forty-five years ago California courts adopted a more modern approach, which viewed the doctrine as based on equitable principles of estoppel. . . . Under this approach, a plaintiff will not be held to have elected between remedies unless he affirmatively pursues a particular remedy to defendant's disadvantage. . . . Other miscellaneous exceptions have also developed to limit the doctrine's applicability. . . . The net effect of these developments has been to establish a trend in the law toward the ever greater restriction of the election of remedies doctrine. [¶] One limitation on the doctrine . . . is the requirement that the plaintiff seek inconsistent remedies in causes of action based on the same set of facts. [Citing and discussing *Glendale Federal* and *Symcox*, and noting that in those cases, the plaintiff's several claims were based on differing operative facts.] In like manner, the Bakers' fraud in the inducement and breach of contract causes of action arise out of different obligations and different operative facts. [The construction contractors] were obliged to deal honestly with the Bakers and to perform their contract with them. The fraud in the inducement of the remodeling contract allegedly perpetrated by [the construction contractors] and [the construction contractors'] later breach violated those separate obligations and also involved separate acts at different points in time. Consequently, the court below erroneously applied the election of remedies doctrine against the Bakers' [cause of action for fraud in the

inducement]. As a result of that error, the court improperly granted summary judgment against the Bakers on that cause of action. [¶] As for the Bakers' [causes of action for breach of contract and intentional and negligent infliction of emotional distress], we cannot determine from the record whether those actions are based on the same or different facts. . . ." (150 Cal.App.3d at pp. 145-146.)

The *Baker* court held that without a showing that these latter causes of action were all based on the "same set of facts," summary judgment could not be granted on these causes of action either. Moreover, the *Baker* court noted, the construction contractors' moving papers "do not even mention, much less establish, any prejudice resulting from the Bakers' attachment." (150 Cal.App.3d at p. 146.) Thus the "partial summary judgment" was ordered vacated.

The *Baker* court continued even further, stating an "alternative ground" for its ruling with respect to the infliction of emotional distress claims: "The Legislature has determined attachments may properly issue only to secure anticipated recoveries on contract claims in fixed or readily ascertainable amounts. (§ 483.010, subds. (a) and (b).) By necessary implication, attachments generally are unavailable on tort claims due to their unascertainable value.[16] It does not automatically follow, however, that where contract and tort causes of action are joined the creditor loses his right to attach. Attachment should always be available to secure liquidated contract claims seeking damages completely separate from those sought under a tort claim even when the claims are based on some common facts. Here, the medical expenses and damages for emotional distress claimed by the Bakers . . . are separate and distinct from the contract damages . . . . Accordingly, the writ of attachment could properly issue under [the contract cause of action]. . . . Consequently, for this additional reason, the court improperly granted summary judgment . . . ." (*Baker* v. *Superior Court, supra,* 150 Cal.App.3d at pp. 146-147.)

Finally, in *Pat Rose Associates* v. *Coombe* (1990) 225 Cal.App.3d 9, 18-19 [275 Cal.Rptr. 1], the cross-complainant was suing for breach of lease and fraud in the inducement of a contract to purchase a hotel. Although the cross-complainant obtained and levied a writ of attachment on the lease

---

[16]Attachments are generally unavailable on tort claims even aside from their unascertainable value, because attachment is available only on claims "based upon a contract, express or implied." (§ 483.010, subd. (a).) Thus unless perhaps a tort claim were characterized as a claim of implied contract or quasi-contract, attachment would not be available on a tort claim due to the necessity of satisfying the contract element. (See, e.g., *Arcturus Mfg. Corp.* v. *Rork* (1961) 198 Cal.App.2d 208 [17 Cal.Rptr. 758] [general manager of plaintiff corporation who took kickbacks sued in quasi-contract].)

claim, it was not found barred from proceeding on the fraud claim because the "causes of action for fraud and breach of contract arose at different times from separate obligations and separate operative facts."

Thus there has been a steady trend reducing the use of the judge-made election of remedies doctrine to penalize the use of the statutory remedy of attachment.

6) *Summary of the post-Randone law on election of remedies in the attachment context.*

In the post-*Randone* era, attachment law is far different than it was when the election of remedies doctrine first came to be applied in the attachment context, and so is the law regarding the defense of election of remedies. The election doctrine is now viewed as harsh and disfavored. (*Baker* v. *Superior Court, supra,* 150 Cal.App.3d at p. 145.) As a harsh and disfavored doctrine, it is being narrowed and restricted. (*Ibid.*) *Glendale Federal,* for example, recognized a sweeping limitation on the election of remedies doctrine in the attachment context, ruling that the doctrine does not apply when differing operative facts are involved in the contract and tort claims. (*Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 137; see also, e.g., *Pat Rose Associates* v. *Coombe, supra,* 225 Cal.App.3d at p. 19; *Symcox* v. *Zuk, supra,* 221 Cal.App.2d at p. 391.) This is a far-reaching limitation on the doctrine, since a claim of fraud (or any other tort) will almost necessarily involve elements differing from a contract claim. (If all the elements were precisely the same, both claims would normally be the same claim, not different.)[17] Nor is a tort claim forfeited by election of remedies if the facts material to the contract claim arise at a different time than those material to the tort claim (*Baker* v. *Superior Court, supra,* 150 Cal.App.3d at p. 146; *Pat Rose, supra,* 225 Cal.App.3d at pp. 18-19), nor if the contract and tort claims arise out of different rights and duties (*Baker, supra,* 150 Cal.App.3d at p. 146.) These restrictions largely eliminate the application of the doctrine in the attachment context, because—with the possible exception of circumstances like those presented in *Steiner* v. *Rowley, supra,* 35 Cal.2d 713,[18]—a contractual obligation is different than a tort duty. Moreover, the inapplicability of the doctrine when tort and contract claims arise out of different rights and duties a fortiori makes the doctrine inapplicable when the plaintiff's tort claims are directed at wholly different defendants than the contract claims. Each separate defendant owes a wholly separate duty which each separately is obligated to

---

[17]This was essentially the situation in *Steiner,* discussed *ante,* in footnote 15. *Steiner* predates *Randone* and the comprehensive revision of the attachment statutes. Whether it would be decided the same way today is questionable.

[18]See footnotes 15 and 17, *ante.*

discharge. In the instance of wholly different defendants, different operative facts and separately enforceable legal rights and duties are clearly involved. Nor are tort claims barred by the election doctrine if different elements of damage are sought in the contract and tort claims. (*Baker, supra,* 150 Cal.App.3d at pp. 146-147.)

Adding to these restrictions on the election of remedies doctrine is the proviso that the doctrine does not apply to forfeit tort claims unless the defendant has suffered "substantial prejudice" as a result of the plaintiff's attachment. (See, e.g., *Glendale Fed. Sav. & Loan Assn.* v. *Marina View Heights Dev. Co., supra,* 66 Cal.App.3d at p. 137.) Under current circumstances, it is incongruous to speak of any defendant being "substantially prejudiced" by enforcement of the plaintiff's statutory rights. Attachment now can be had only after the intervention of an impartial judge who orders attachment only after holding a hearing, making evidentiary findings, etc., with full due process protections. (See, e.g., § 484.090 [required findings, including an evaluation of the merits and a finding that the plaintiff's claim is probably valid]; see also *Sniadach* v. *Family Finance Corp., supra,* 395 U.S. 337 (conc. opn. of Harlan, J.) [due process is satisfied if a finding of "probable validity" of plaintiff's claim is made before defendant is deprived of his property]; see also, generally, § 484.010 et seq. [noticed hearing procedure for obtaining writ of attachment].)[19]

The doctrine of election of remedies is simply an application of the broader concept of equitable estoppel. (See, e.g., *Baker* v. *Superior Court, supra,* 150 Cal.App.3d at p. 146.) Before an equitable estoppel can properly be applied, there must be an inequity to be remedied by the estoppel. It can hardly be considered "inequitable" for a plaintiff to avail itself of protections which have been authorized by the Legislature, and which can be implemented only by prior court order issued with full observance of constitutional due process requirements. Yet unless there is an inequity in utilizing the current attachment statutes, there is no basis for an equitable estoppel.[20]

---

[19]A party who obtains analogous provisional relief from a judge via injunction would not be estopped from thereafter pursuing tort remedies. Even in the case of the lis pendens, in which a creditor can still unilaterally effectuate what is in practical effect a provisional remedy without prior approval by a judge, tort remedies can still thereafter be pursued.

[20]Conceivably a court might justifiably find such an "inequity" if, for example, a plaintiff were to obtain and levy an attachment by filing knowingly false declarations. No such facts are involved in this case, however, and hence we merely note that this issue remains undecided. Even in such a hypothetical case, the Legislature has provided remedies (see § 490.010 et seq.), and in addition has specifically preserved common law theories of recovery (§ 490.060), which could offset a plaintiff's tort claim even in the absence of an election of remedies. (See, e.g., legis. com. com., 15A West's Ann. Code Civ. Proc. (1979 ed.) foll. § 490.010, pp. 357-358 [statutes do "not limit the common law remedies for wrongful attachment such as malicious prosecution and abuse of process]; see also *White*

Application of an equitable estoppel may have been justified during a time when unilateral seizure of a defendant's property could summarily be effected under pre-*Randone* law, but those days are gone. Any justifiable rationale for an equitable estoppel forfeiting meritorious tort claims largely evaporated with *Randone*. "When the reason of a rule ceases, so should the rule itself." (Civ. Code, § 3510; see also Civ. Code, § 3509 [maxims intended to aid in "just application" of the codes].)

B. *Application of the law to the facts of this case.*

■ Even assuming that the election doctrine remains available to shield defendants from meritorious tort claims in the context of attachment in some situations, it is clear that this is not one of them. By several of the measures discussed above, the individual defendants here are not entitled to be shielded from Waffer's tort claims. Waffer's attachment was obtained against a different party (Edison) on a different claim (Waffer's claim for breach of the settlement agreement) which did not involve the individual defendants and which was obtained in a different action (the parallel action). The individual defendants were not even parties to the settlement agreement on which the attachment was ordered. Waffer is suing the individual defendants for conversion and fraud, not breach of the settlement agreement. The claims against the individual defendants do not arise out of the same operative facts (the settlement agreement and its breach) but instead out of different operative facts (the false promises, the presentation of false information to the international shipper, the hiding of Edison's assets, etc.). In addition, these different operative facts occurred at a different time from breach of the settlement agreement. Finally, the individual defendants have shown no "substantial prejudice," even assuming that a judge could ever be considered to have "prejudiced" a defendant in a legal sense by ordering relief under the Attachment Law as legislatively intended and consistently with constitutional mandates.

The individual defendants note that " ' "[i]f a given state of facts entitles one to recover damages upon the theory of tort, and the same set of facts entitles him to recover upon the theory of contract, it would be seem plain that recovery could not be twice had because the facts would support recovery upon either theory," ' " quoting from *DuBarry Internat., Inc.* v. *Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 564 [282 Cal.Rptr. 181]. Ranging out from this proposition, the individual defendants argue that Waffer is barred from pursuing tort remedies against them because Waffer is pursuing contract remedies against Edison for the same

*Lighting Co.* v. *Wolfson* (1968) 68 Cal.2d 336 [66 Cal.Rptr. 697, 438 P.2d 345] [discussing malicious prosecution and abuse of process claims as remedies for wrongful attachment].)

damage: nonpayment for the monitors. The argument is inapt. The quote from *DuBarry* stands for the undeniable proposition that Waffer is not entitled to a double recovery. The fact that Waffer is not entitled to a duplicative recovery from the individual defendants, however, does not translate into a conclusion that Waffer is not entitled to *any* recovery from the individual defendants. It is correct that Waffer may not recover twice for the same damage. Subject to that proviso, however, Waffer may pursue a full recovery by prosecuting its tort claims against the individual defendants. The trial court therefore should not have eliminated Waffer's tort claims by granting summary judgment on election of remedies grounds. The tort claims must be decided on their merits, and the summary judgment is therefore reversed.

## III. DISPOSITION.

The summary judgment is reversed. The matter is remanded for further proceedings not inconsistent with this opinion. Appellant to recover costs.

Boren, P. J., and Mallano, J.,* concurred.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.