[No. B194637. Second Dist., Div. Eight. May 29, 2007.]

CHARLES MATTHAU et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
WILLIAM MORRIS AGENCY, LLC, Real Party in Interest.

**COUNSEL**

Iverson, Yoakum, Papiano & Hatch, Neil Papiano and Virginia Sanderson for Petitioners.

No appearance for Respondent.

Rintala, Smoot, Jaenicke & Rees, William T. Rintala, Michael B. Garfinkel and Anne S. Cruz for Real Party in Interest.

**OPINION**

**BOLAND, J.—**

## SUMMARY

A talent agency represented an actor for 40 years, receiving a commission of 10 percent of all compensation received by the actor under motion picture employment contracts negotiated or procured by the agency. After the actor's death, his son, who succeeded to the actor's rights under his motion picture

employment contracts, ceased to pay the agency's commission on profit participation payments received under the employment contracts. The talent agency sought to compel arbitration with the actor's son and a "loan out" company through which the actor periodically provided his services. Arbitration was sought under the talent agency's contracts with the deceased actor, and under a collective bargaining agreement between the Screen Actors Guild and the talent agency's trade association. Because neither the son nor the loan out company were parties to any of the agreements under which the talent agency sought arbitration, and because none of the legal principles under which a nonsignatory may be bound to another's agreement to arbitrate applies, the trial court erred in granting the talent agency's petition to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

Real party in interest William Morris Agency, LLC, is a talent agency which represented actor Walter Matthau from 1960 until his death in 2000. During the early years, their relationship was governed by written contracts, the last of which expired in 1970. Thereafter, the agency relationship continued as before, albeit without a written contract, with William Morris receiving commissions equal to 10 percent of the gross compensation received by Matthau under contracts of employment entered into during the agency relationship.

Matthau was a member of the Screen Actors Guild (SAG), and William Morris was and is a member of the Association of Talent Agents (ATA) and its predecessors. The relationship between Matthau and William Morris was governed by a collective bargaining agreement between SAG and ATA. The codification of the collective bargaining agreement is known as SAG's "Rule 16(g)" or "Agency Regulations."

Rule 16(g) includes the basic contract between SAG and ATA, and governs all aspects of the relationship between an actor and the actor's agent, including the form and content of any written contract between actor and agent covering representation in theatrical and television motion pictures. Deviations require the written approval of SAG. The regulations are extensive, and include provisions on compensation to the agent (a percentage of "all moneys or other consideration received by the Actor, directly or indirectly, under contracts of employment . . . entered into during the term" of the agency contract, with a cap of 10 percent), and many other matters. Rule 16(g), for example, requires all contracts to be in writing, and provides that

contracts not in writing or not complying with the regulations are void. The form of contract in Rule 16(g) provides that the agent is entitled to its commission after the expiration of the contract term "for so long a period thereafter as the Actor continues to receive moneys or other consideration under or upon employment contracts entered into by the Actor during the term . . . ."

Rule 16(g) also contains an arbitration clause, providing in pertinent part as follows: "All disputes and controversies of every kind and nature whatsoever between an agent and his client arising out of or in connection with or under any agency contract between the agent and his client . . . as to the existence of such contract, its execution, validity, the right of either party to avoid the same on any grounds, its construction, performance, non-performance, operation, breach, continuance, or termination, shall be submitted to arbitration regardless of whether either party has terminated or purported to terminate the same."

Although Matthau and William Morris had no written agency contract after 1970, Matthau routinely paid William Morris 10 percent of his earnings under employment contracts procured and negotiated by William Morris for the next 30 years. Matthau also received compensation through certain "loan out" companies through which he rendered his acting services, and these companies likewise paid William Morris commissions on monies they received for Matthau's acting services. After Walter Matthau's death in 2000, his surviving spouse, Carol Matthau, continued to pay William Morris its 10 percent commission on profit participation payments and residual interests received by Matthau's heirs or loan out companies in connection with Matthau's employment contracts. The loan out companies were combined after Matthau's death to form one company, called The Matthau Company (TMC), whose president was the Matthaus' son, Charles Matthau.

In July 2003, Carol Matthau died, and Charles Matthau (Charles) succeeded to her rights in the profit participation payments under Walter Matthau's employment contracts. Charles continued to send William Morris commissions on compensation received under Matthau's employment contracts until January 2004. Thereafter, Charles stopped paying the commissions to William Morris.

In December 2005, William Morris submitted a statement of claim and demand for arbitration to SAG's arbitration tribunal, naming as respondents Charles Matthau, executor of Walter Matthau's estate, and one of the loan out companies. Charles took the position no valid contract existed under which William Morris could make a claim and declined the arbitration demand.

On June 13, 2006, William Morris filed a petition to compel arbitration between William Morris, on the one hand, and Charles and TMC, on the other, before the SAG arbitration tribunal. After a hearing, the trial court granted William Morris's petition to compel arbitration. Its minute order does not state the rationale for its decision.[1]

Charles and TMC filed a petition for a writ of mandate, seeking an order directing the trial court to vacate its order compelling arbitration. This court directed William Morris to file a preliminary response to the petition. After review of the preliminary response and a reply filed by petitioners, we issued an alternative writ, ordering the trial court to vacate its order or show cause why a peremptory writ requiring it to do so should not issue. William Morris filed a written return to the petition, Charles and TMC filed a reply, and the order to show cause was heard on March 28, 2007.

We now grant the writ petition.

## DISCUSSION

William Morris's attempt to compel Charles and TMC to arbitrate William Morris's claim for commissions runs aground on a very simple obstacle. A petition to compel arbitration seeks specific performance of an agreement to arbitrate, and neither Charles nor TMC is a party to any agreement with William Morris. Nor is there any legal principle under which they may be bound by Walter Matthau's agreements to arbitrate disputes with William Morris. Accordingly, the trial court should have denied William Morris's petition to compel arbitration. We first discuss the legal terrain and then address the arguments raised by William Morris.

A. *None of the circumstances in which a nonsignatory may be bound by another person's agreement to arbitrate exist in this case.*

The applicable legal principles have been stated many times. The right to arbitration depends on a contract, and a party can be compelled to submit a dispute to arbitration only if the party has agreed in writing to do so. Arbitration is a favored method of resolving disputes, but the policy favoring arbitration does not eliminate the need for an agreement to arbitrate and does not extend to persons who are not parties to an agreement to arbitrate. (*Boys Club of San Fernando Valley, Inc. v. Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271 [8 Cal.Rptr.2d 587] (*Boys Club*).)

---

[1] The court's minute order incorporates its "[f]urther findings . . . as reflected in the notes of the official court reporter . . . ." The reporter's transcript, however, is not a part of the record submitted to the Court of Appeal.

Of course, circumstances exist under which persons who have not signed an agreement to arbitrate are nevertheless bound to do so. Indeed, one court, reviewing the cases, observed that, "in varying circumstances, California courts have repeatedly enforced arbitration agreements against and in favor of persons who never agreed to arbitrate the dispute." (*Keller Construction Co. v. Kashani* (1990) 220 Cal.App.3d 222, 228 [269 Cal.Rptr. 259] (*Keller*).) An agent, for example, may have implied authority to agree to arbitration on behalf of its principal. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 709 [131 Cal.Rptr. 882, 552 P.2d 1178] [an agent or fiduciary who contracts for medical treatment on behalf of his beneficiary retains the authority to enter into an agreement providing for arbitration of claims for medical malpractice].) A child is bound by a parent's contract to arbitrate medical malpractice claims with a group health plan. (*Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 607–608, 610 [43 Cal.Rptr. 697, 401 P.2d 1].) A husband contracting for a health plan for himself and his wife has the implied authority to agree for himself and his wife to arbitrate claims arising out of medical malpractice, and the nonsignatory wife is bound by the agreement to arbitrate. (*Hawkins v. Superior Court* (1979) 89 Cal.App.3d 413, 419 [152 Cal.Rptr. 491].) Adult heirs of a member of a group health plan were bound to arbitrate their claim for the wrongful death of the member, where the member expressly agreed to arbitration of claims by his heirs, and where minor heirs were bound to arbitrate and the wrongful death cause of action could not be split. (*Herbert v. Superior Court* (1985) 169 Cal.App.3d 718, 720, 725 [215 Cal.Rptr. 477].) A general partner of a limited partnership, as agent of the partnership and beneficiary of its contracts, was bound by an arbitration agreement entered into by the partnership. (*Keller, supra,* 220 Cal.App.3d at pp. 228–229.)

■ One court has stated the principle informing nonsignatory arbitration cases as follows: "The common thread . . . is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. In the absence of such a relationship, courts have refused to hold nonsignatories to arbitration agreements." (*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 76 [100 Cal.Rptr.2d 683] (*Norcal*); see also *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 243 [54 Cal.Rptr.2d 628] (*Contra Costa*) ["[a]ll nonsignatory arbitration cases are grounded in the authority of the signatory to contract for medical services on behalf of the nonsignatory—to bind the nonsignatory in some manner"].) *Contra Costa* found two categories of cases binding nonsignatories to arbitrate their claims: those where a benefit

was conferred on the nonsignatory as a result of the contract, making the nonsignatory a third party beneficiary of the arbitration agreement, and those where the nonsignatory was bound to arbitrate "because a preexisting relationship existed between the nonsignatory and one of the parties to the arbitration agreement, making it equitable to compel the nonsignatory to also be bound to arbitrate his or her claim." (*Contra Costa, supra,* 47 Cal.App.4th at p. 242.) The "preexisting relationship"—such as spouses and children in medical malpractice claims—supports the implied authority of the party to bind the nonsignatory. (See *id.* at p. 243 [no preexisting relationship between cross-complainants (indemnity claimants) and either agreement party "that could support any implied authority for [either party] to bind any of the cross-complainants by their arbitration agreement"].)

None of the circumstances summarized in *Norcal* or *Contra Costa* exists in this case, as to either TMC or Charles. Neither Charles nor TMC was a third party beneficiary of any agreement between Walter Matthau and William Morris. Nor was there any agency or similar relationship between Charles or TMC, on the one hand, and Walter Matthau, on the other, giving Matthau the implied authority to bind Charles and TMC to Matthau's agreement. Absent some form of implied authority, there is simply no basis upon which to bind Charles and TMC to Matthau's agreement to arbitrate disputes with William Morris. We address William Morris's contentions as to TMC and Charles in turn.

B. *No legitimate basis is proffered for subjecting TMC to Walter Matthau's arbitration agreement.*

William Morris presents several arguments in its attempt to avoid the conclusion that no agreement to arbitrate exists between TMC and William Morris. None has merit.

1. *The loan out argument.*

TMC may be compelled to arbitrate this dispute with William Morris only if it is a party to the arbitration agreement or if an alternative basis exists to bind it to an agreement it did not sign. William Morris asserts that because Walter Matthau would be obligated under Rule 16(g) to arbitrate this dispute with William Morris if he were alive today, TMC is likewise obligated to arbitrate "[a]s Walter Matthau's loanout during his lifetime . . . ." William Morris states, without citation to legal or contractual authority, that "[b]ecause TMC and its predecessors were directly involved in loaning out Walter

Matthau's services and interacted directly with William Morris, TMC is directly bound to all SAG regulations." But nothing in the law, in Rule 16(g), or in the record supports this contention.

It is undisputed that Walter Matthau periodically utilized loan out companies, so that some payments for his services were made to the companies. However, nothing in Rule 16(g) itself imposes any obligations on loan out companies. Indeed, the only reference cited by William Morris in Rule 16(g) to loan out companies is the definition of the term. A loan out company is defined as "a corporate or other entity which has the right to the actor's personal services in the motion picture industry and actor's services are performed through loanouts to employers." The definition further states that "agency services" include "the representation of the actor for engagements through a loan out company, if one exists or is created during the period of actor representation by the agent." On its face, this provision imposes no obligations upon or to loan out companies.

William Morris maintains, again without citation to any authority, that Rule 16(g) governs an agency's services "in representing an actor's loanout company." But Rule 16(g) does not state or suggest that the agency "represent[s] an actor's loanout company." It expressly states the agency represents the actor, and does so "for engagements through a loan out company," if one exists. When loan out companies are used by actors, the loan out company, rather than the actor, receives the compensation due from the studio or other employer for the actor's services. Rule 16(g)'s definition merely insures that the agency's services—and compensation for those services—include representing the actor for engagements the actor decides to structure through a loan out company. But it is clearly the actor, not any loan out company he may use, who is a member of SAG, is represented by the agency, and is obligated to pay commissions on compensation "received by the Actor, directly or indirectly . . . ."

Of course, it is theoretically possible that Walter Matthau structured his loan out companies so that they were obligated to pay commissions directly to William Morris, or that Walter Matthau otherwise created an agency or other similar relationship with his loan out companies under which they could be bound by his agreements with William Morris. However, no evidence in the record establishes any such relationship or connection. In short, there is a complete lack of proof of any basis for binding TMC to Walter Matthau's agreement to arbitrate disputes with William Morris: no evidence of an agency relationship between Matthau and TMC, and no evidence of any other form of implied authority on Matthau's part to bind TMC to his agreement to arbitrate. (*Norcal, supra,* 84 Cal.App.4th at p. 76.)

In short, because nothing in Rule 16(g) purports to create any obligation as between the agency and a loan out company, and because there is no evidence of any other basis for binding TMC to Walter Matthau's agreement in Rule 16(g) to arbitrate disputes with William Morris, no basis exists for William Morris's assertion that TMC "is directly bound to all SAG regulations."

### 2. The third party beneficiary argument.

■ William Morris also asserts TMC is a third party beneficiary of the agency agreements between Walter Matthau and William Morris, and is therefore bound by their agreement to arbitrate disputes. Again, no legal or contractual support exists for this proposition. Third party beneficiary theory has no application to the circumstances of this case. A third party beneficiary is someone who may enforce a contract because the contract is made expressly for his benefit. (See Civ. Code, § 1559 ["[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it"].) The mere fact that a contract results in benefits to a third party does not render that party a "third party beneficiary." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46] [a third party's rights under a contract are predicated upon the contracting parties' intent to benefit the third party; " '[t]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.' . . ." (citation omitted)].) TMC is obviously not a third party beneficiary that could have enforced Walter Matthau's agreement with William Morris. Conversely, there is no basis for enforcing Walter Matthau's agreement to arbitrate with William Morris against TMC.

### C. William Morris proffers no legitimate basis for subjecting Charles (or TMC) to Walter Matthau's arbitration agreement.

William Morris offers several other reasons for subjecting both Charles and TMC to an arbitration agreement to which they are not parties.

### 1. The "successor-in-interest" and Civil Code section 1589 arguments.

William Morris contends that Charles and TMC are bound to the arbitration agreement in Rule 16(g) because they are the "successors-in-interest" to Walter Matthau's agency contracts with William Morris and the resulting

employment contracts procured and negotiated by William Morris. William Morris cites no pertinent authority for this proposition, and it is unsupported by law or contract. As to the agency contracts, it is difficult to see, even theoretically, how there could be a "successor-in-interest" to an actor in a personal services contract between the actor and a talent agent. And, even if a successor in interest were theoretically possible, William Morris cites no provision in Rule 16(g), or in the written agency contracts between Matthau and William Morris, that purports to bind Walter Matthau's successors or assigns, or that states the agreements inure to the benefit of Walter Matthau's successors or assigns. Finally, none of the arbitration cases William Morris cites, finding nonsignatories bound to arbitration agreements, has suggested that successors in interest are, by virtue of that status and in the absence of any contractual agreement, bound by an arbitration clause executed by a predecessor.

■ In a related argument, William Morris contends that, because Charles and TMC have "accepted the benefits" of William Morris's work for Walter Matthau—in that they now receive any funds due Walter Matthau under employment contracts with third parties that William Morris negotiated for Matthau—Charles and TMC "are bound to arbitrate these disputes." We do not agree. William Morris relies on Civil Code section 1589 (section 1589), which provides that "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." The maxim of section 1589, however, has no application to this case. It is a part of the Civil Code on contracts, and specifically of the chapter governing consent. Its principal application is to the parties to the original transaction, and to cases of assignment where the assignee's assumption of liability may be implied from his acceptance of rights and privileges under the contract. (*Recorded Picture Company [Productions] Ltd. v. Nelson Entertainment, Inc.* (1997) 53 Cal.App.4th 350, 362 & fn. 6 [61 Cal.Rptr.2d 742] (*Recorded Picture Co.*) [§ 1589 may apply to a party to the original contract, to an assignee of the contract, to a person who accepts all of the benefits of the contract, or to a person who expressly assumes the obligations of the contract]; see 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 740, pp. 824–827.)

Charles and TMC do not come within any reasonable application of section 1589. They were not parties to the contract between Walter Matthau and William Morris, in which the benefit Matthau received was William Morris's agency services. Charles and TMC did not receive or accept agency services from William Morris. Similarly, Charles and TMC are not assignees of the

agency contract and did not assume the obligations of the agency contract. The only benefits Charles and TMC have accepted are from Matthau's employment contracts, not from his agency contract. While Charles and TMC may benefit indirectly from William Morris's work in negotiating the employment contracts, no precedent exists for applying section 1589 in such an attenuated fashion. (See also *Recorded Picture Co., supra*, 53 Cal.App.4th at p. 363 [§ 1589 did not apply to a third party who accepted only a portion of the benefits of a contract through a later agreement with one of the original contracting parties].) In short, section 1589 does not operate to require Charles and TMC to arbitrate William Morris's claim.

### 2. *The 1967 agency contract argument.*

██ Finally, William Morris argues Charles and TMC are bound by the arbitration agreement in the 1967 agency contract between Walter Matthau and William Morris that expired in 1970. It theorizes that a written agreement to arbitrate can be extended or renewed by an oral or implied contract (Code Civ. Proc., § 1280, subd. (f)), and that the question whether the 1967 contract was extended or renewed is an issue for the arbitrator. We do not disagree with either point. The question before this court, however, is not whether the 1967 agreement between Walter Matthau and William Morris was extended by an oral or implied agreement. It is whether Charles and TMC are bound by an arbitration agreement they did not sign. "Whether or not an arbitration agreement is operative against a person who has not signed it involves a question of 'substantive arbitrability' which is to be determined by the court. . . ." (*Boys Club, supra*, 6 Cal.App.4th at p. 1271, citation omitted.) As we have seen, the point has been determined adversely to William Morris.

### CONCLUSION

In sum, neither TMC nor Charles signed any agreement with William Morris. No evidence has been presented of any agency or similar relationship between TMC and Walter Matthau under which Walter Matthau had the implied authority to bind TMC to his agreements to arbitrate disputes with William Morris. TMC was not a third party beneficiary of Walter Matthau's agency agreements. Walter Matthau's agreements did not even purport to bind his successors and assigns. Under these circumstances, neither TMC nor Charles can be compelled to arbitrate William Morris's claim for commissions, and the trial court erred in ruling otherwise.

## DISPOSITION

The writ petition is granted. Let a peremptory writ of mandate issue directing the trial court to vacate its order of August 31, 2006, granting the petition of William Morris Agency to compel arbitration and to enter a new and different order denying the petition. Costs are awarded to petitioners.

Cooper, P. J., and Flier, J., concurred.

A petition for a rehearing was denied June 26, 2007, and the petition of real party in interest for review by the Supreme Court was denied August 15, 2007, S154167.