Filed 10/11/13  Promise Hospital v. Cigna Corp. CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PROMISE HOSPITAL OF EAST LOS ANGELES, L.P.,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>CIGNA CORPORATION et al.,<br><br>　　　　Defendants and Respondents. | B243126<br><br>(Los Angeles County<br>　Super. Ct. No. BC471944) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Michelle R. Rosenblatt, Judge.  Affirmed.

Hooper, Lundy & Bookman, Glenn E. Solomon and Devin M. Senelick for Plaintiff and Appellant Promise Hospital of East Los Angeles.

Lee Tran & Liang, Henry Wang and Kevin Bringuel for Defendant and Respondent City of Long Beach.

_____

Promise Hospital of East Los Angeles appeals from the order denying its petition to compel the City of Long Beach to arbitrate a dispute arising from the City's failure to pay for medical services that the hospital provided to a City employee who was covered under the City's health insurance plan. We affirm that order because the City was not a party to the contract that contained the disputed arbitration provision and because the exceptions that allow for enforcing such provisions against non-contracting parties do not apply here.

## FACTS AND PROCEDURAL HISTORY

This dispute arises from two separate contracts – each signed by pairs of separate parties – that concerned providing healthcare benefits to employees of the City of Long Beach. The first contract was signed in March 2007 by Great-West Healthcare, Inc., and Promise Hospital of East Los Angeles, LP. It was labeled a hospital services agreement and, in general terms, obligated the hospital to provide healthcare services to persons covered under health care insurance plans that were offered or administered by other entities. The second contract was signed in the latter part of 2008 by the City and Great-West Life & Annuity Insurance Co.[1] Under this administrative services contract, Great-West Life agreed to serve as administrator of the City's self-funded health insurance plan for City employees and secure the services of healthcare entities to provide medical care under that plan. Pursuant to its agreement with Great-West Healthcare under the hospital service agreement, Promise provided healthcare services to City employees who were covered by the City's employee healthcare plan.

This dispute arose when Great-West Life denied Promise's $1.5 million claim for healthcare services provided to a City employee because Great-West Life contended that the employee's hospital stay exceeded the scope of coverage under the health insurance

---

[1] We observe the obvious similarities in the names of the two Great-West entities, which apparently were acquired and now are CIGNA Corporation affiliated entities. For ease of reference, we refer to Great-West Healthcare Inc. as Great West Healthcare and Great-West Life and Annuity Insurance Co. as Great-West Life.

plan. Promise sued the City and the two Great-West entities for breach of contract and other causes of action.[2] Promise then brought a petition to compel the City and the various Cigna entities to arbitrate the dispute pursuant to an arbitration provision that appeared in the hospital services agreement between Great-West Healthcare and Promise, but did not appear in the administrative services contract between the City and Great-West Life.

Promise contended that the City could be required to arbitrate the dispute even though it was not a party to the hospital services agreement with Great-West Healthcare for three reasons: (1) the City was equitably estopped from avoiding arbitration because it accepted the benefits of healthcare services from Promise pursuant to the hospital services agreement; (2) the City was a third party beneficiary of that agreement; and (3) Great-West Life was the City's agent and had the authority to bind the City to arbitrate under the hospital services agreement. The trial court rejected those contentions and denied the petition.[3]

## STANDARD OF REVIEW

A party to a contract containing an arbitration provision may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement. (Code Civ. Proc., § 1281.2.) The petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. (*Segal v. Silberstein* (2007) 156 Cal.App.4th 627, 633.)

---

[2] By this time Cigna Corporation had acquired both Great-West Healthcare and Great-West Life, and renamed them under the Cigna banner. As a result, Promise also sued these various Cigna entities as successors in interest to the two Great-West entities. There is no dispute that Cigna's liability is based solely on its status as successor in interest to the separate Great-West corporations, and the parties analyze the issues accordingly.

[3] Promise's petition was also brought, and granted, as to the Cigna and Great-West entity defendants. They have not appealed the order, and our discussion is therefore limited to whether the City must also arbitrate the dispute.

3

If there is no disputed extrinsic evidence, we apply independent review to determine whether the dispute is arbitrable. If there is conflicting evidence, we affirm the trial court's factual findings so long as they are supported by substantial evidence. (*Suh v. Superior Court* (2010) 181 Cal.App.4th 1504, 1513 (*Suh*).) The City contends there is conflicting evidence because its director of human resources submitted a declaration claiming that the City neither gave nor intended to give Great-West Life any agency authority to bind the City to an arbitration provision, and that the City had never been informed of the existence of the hospital services agreement or that providers such as Promise operated under agreements that contained arbitration provisions.

Promise contends these factual assertions have no bearing on our interpretation of the undisputed language of the contracts at issue. We agree with Promise as to the City's assertion concerning its intentions about any grant of agency authority. However, as we discuss in section 3., *post,* the City's knowledge of the contract's existence is at issue in regard to the "direct benefits" estoppel theory advanced by Promise. As a result, we resolve that factual issue in the City's favor, but interpret the contract as a matter of law in light of that factual finding. In all other regards we exercise independent review.

**DISCUSSION**

1.      *Relevant Terms of the Applicable Contracts*

      A.      <u>The Hospital Services Agreement Between Promise and Great-West Healthcare</u>

The hospital services agreement states that it was made for the benefit of both Promise and Great-West Healthcare "and its [a]ffiliates." The term "affiliate" was defined to mean "any person or entity that, either directly or indirectly, controls, is controlled by, or is under common ownership or control with [Great-West Healthcare] and [Promise], or with whom [Great-West Healthcare] has a marketing or administrative arrangement." A list of affiliates that could "access this agreement" was included. These were: "Great-West Life . . . Alta Health & Life Insurance Company (subsidiary of

4

Great-West Life) . . . New England Life Insurance Company (marketing/administrative arrangement) . . . Metropolitan Life Insurance Company (marketing/administrative arrangement associated with New England business) . . . Other Great-West Healthcare entities . . . Self-funded Payors."

The term "payor" was defined to mean a wide-range of private and governmental entities, self-insured employers, health maintenance organizations, third party administrators, and others that have "entered into an agreement with [Great-West Healthcare], a [Great-West Healthcare] Affiliate, and any client of these entities that has entered into an agreement with [Great-West Healthcare], a [Great-West Healthcare] Affiliate, or any of the aforementioned entities, and has agreed to be responsible for funding benefit payments for Covered Services provided to Members under a Health Benefits Plan." Payors were solely responsible for paying Promise and Great-West Healthcare had no obligation to pay Promise for covered services the hospital provided.

Under the heading, "<u>No Third Party Beneficiary</u>," the agreement said it was "made solely and specifically among and for the benefit of the parties hereto, and their respective successors and assigns, and no other person shall have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise, including, but not limited to, [health care plan members]."

The hospital services agreement included an arbitration provision that applied to "[a]ny dispute, controversy or claim arising out of or relating to this Agreement, or the breach thereof, including, but not limited to the payment or non-payment of a claim, the eligibility of a Member, the determination of Covered Services, or a determination as to medical necessity . . . ."

Finally, the persons who signed the agreement "represent and warrant that they are authorized to bind the party on whose behalf they sign this Agreement" to its terms and conditions. The agreement was signed on behalf of Great-West Healthcare by its president at its office in Glendale, California.

5

B.       The Administrative Services Contract Between the City and Great-West
         Life

The administrative services contract between the City and Great-West Life was executed over a year later and appointed Great-West Life to serve as administrator of the City's employee health insurance plan. This included contracting with networks of healthcare providers to furnish health care services pursuant to the employee health insurance plan. Although the City was the plan fiduciary in most regards, Great-West Life was granted the power to handle claim appeals and, in that capacity, only acted as a plan fiduciary. Great-West Life actually paid the providers. Except for its fiduciary duties in that regard, the contract said that Great-West Life "performs purely non-discretionary and ministerial functions for the [City] within a framework of policies, interpretations, rules, practices, and procedures made by the [City]."

The City was responsible for "[r]eimbursing any health care service provider with whom [Great-West Life] has entered into a provider agreement that has provided covered services to a Member . . . ." The City was "responsible, and is a guarantor of payment, for covered benefits under the Plan. [The City] acknowledges that, through provider contracts negotiated by [Great-West Life], [the City], as the party responsible for payment, has certain obligations not inconsistent with the terms of this Contract, even though it is not a party to such provider agreements. As such, any contracted provider may bring a cause of action or assert a lien against [the City] for payment of any unpaid claims for covered services rendered by such provider to a Member."

Both parties acknowledged that the City had "exclusive authority to control and manage" the health insurance plan. Except for its fiduciary duties in regard to handling claim appeals, Great-West Life had "no power, discretion or authority or control over the Plan or Plan assets or responsibility for the terms or validity of the Plan or to alter, modify, or waive any terms or conditions of the Plan, or to waive any breach of any such terms or conditions, or to bind the [City], or to waive any of its rights, by making any statement or by receiving at any time any notice or information. [¶] [Great-West Life] shall have no power, discretion or authority to act for or on behalf of the [City] other than

6

as herein expressly granted, and no other or greater power or authority shall be implied by the grant or denial of power or authority specifically mentioned herein."

Finally, the administrative services contract said that each party would bear its own costs in defending actions related to the plan that were brought by third parties. The contract never mentions arbitration. In signing the healthcare services contract with Promise, the president of Great-West Healthcare represented and warranted that she was authorized to bind her company and no others.

2.     *Principles of Law Concerning Whether Non-Signatories to A Contract With An Arbitration Clause Can Be Compelled to Arbitrate a Dispute*

Although public policy makes arbitration a favored method of dispute resolution, that policy still requires an agreement to arbitrate and does not extend to persons who are not parties to such an agreement. (*Matthau v. Superior Court* (2007) 151 Cal.App.4th 593, 598 (*Matthau*).) There are exceptions to this rule, however. Federal and California courts have identified six theories by which a nonsignatory may either compel someone else, or be compelled, to arbitrate: incorporation by reference; assumption; agency; veil-piercing or alter ego; estoppel; and third party beneficiary. (*Suh, supra,* 181 Cal.App.4th at p. 1511.)

Even though the parties concede that the applicable agreements are covered by the Federal Arbitration Act (9 U.S.C., § 1, et seq.), state law principles govern whether a contract containing an arbitration provision can be enforced by or against nonparties to a contract. (*Arthur Andersen LLP v. Carlisle* (2009) 556 U.S. 624, 630-631; *DMS Services, Inc. v. Superior Court* (2012) 205 Cal.App.4th 1346, 1353, fn. 3 (*DMS Services*).)

California law recognizes three circumstances under which someone who is not a party to a contract with an arbitration provision can be compelled to arbitrate. The first is when the nonsignatory is a third party beneficiary of the contract. The second is where a preexisting relationship existed between the nonsignatory and one of the contracting parties, making it equitable to compel the nonsignatory to arbitrate his claim. (*Crowley*

7

*Maritime Corp. v. Boston Old Colony Ins. Co.* (2008) 158 Cal.App.4th 1061, 1069-1070 (*Crowley Maritime*).) The third involves actions brought by plaintiffs that arise from or are inextricably linked to a contract containing an arbitration provision. Defendants in those actions are allowed to assert estoppel principles to compel the plaintiff to arbitrate. (*JSM Tuscany, LLC v. Superior Court* (2011) 193 Cal.App.4th 1222, 1239-1240.) We take each exception in turn.

### A.   The City Was Not A Third Party Beneficiary

Promise contends the City was a third party beneficiary of the healthcare services agreement and can be compelled to arbitrate on that basis. Under Civil Code section 1559, a contract expressly made for the benefit of a third person may be enforced by him. The word "expressly" in this section means the negative of incidentally. (*Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1022 (*Spinks*).) Beneficiaries can be either incidental or intended beneficiaries, but only the latter qualify as third party beneficiaries who can enforce an agreement. (*Ibid.*)

Determining whether a contract was made for the benefit of a third person turns on the terms of the contract. If the terms necessarily require one party to confer a benefit on another, then the contract and the parties to it intend to benefit that person. (*Spinks, supra,* 171 Cal.App.4th at p. 1022.) It is not enough that the third party would incidentally benefit from performance – the parties must have intended to confer a benefit. As a result, those who are benefitted only incidentally or remotely are not third party beneficiaries. (*Ibid.*) However, the third person need not be named and may be a member of a class of persons who the contracting parties intended to benefit. (*Id.* at p. 1023.)

As noted earlier, the hospital services contract between Promise and Great-West Healthcare states that it was made "among and for the benefit" of those two parties, and that no one else had any rights or entitlement to benefits under the contract as a third party beneficiary or in any other capacity. As Promise points out, this provision can be overcome by a more specific provision that in fact shows the City was an intended

8

beneficiary of the agreement. (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1234-1235.) Promise contends that the contract's preamble, which states that it was intended to benefit Great-West Healthcare and its affiliates, shows such an intent because the contract defines "affiliates" to include "self-funded payors," of which the City was one. We disagree.

First, the definition of affiliate lists various insurance companies, self-funded payors, and Great-West entities – including Great-West Life – that can "access" this agreement. The contract goes on to separately define a payor as an entity, including self-funded insurers, that operate a health insurance plan and have entered a contract with Great-West Healthcare or one of its affiliates. If the City, as a self-funded insurer, is an affiliate of Great-West Healthcare, then it would have been able to access the agreement directly and would have had no need to contract separately with Great-West Life to do so. Instead, as the definition of payor makes clear, self-funded insurers are those who enter contracts with Great-West Healthcare or its affiliates like Great-West Life and agree to pay for covered services provided to members through the hospital services contract. In this context, it seems unlikely that the City was an affiliate of Great-West Healthcare.

The same is true of Promise's contention that the city was an affiliate of Great-West Healthcare because that term was defined to include those with whom Great-West Healthcare had an administrative arrangement. Great-West Healthcare had no such arrangement with the City. Instead, the City's administrative arrangement was with separate corporate entity Great-West Life.[4]

Promise also contends that the nature and terms of the hospital services contract made the City a third party beneficiary because the administrative services contract

---

[4]     In a related argument, Promise contends that the City is bound by the terms of the hospital services agreement because it voluntarily accepted the benefits of that contract. Promise cites Civil Code section 1589 for that proposition, but that section applies only to a party to the original contract, an assignee, someone who assumes the contract, or someone who accepts *all* the benefits of the contract, not just a portion of them. (*Matthau, supra,* 151 Cal.App.4th at pp. 603-604.) None of those situations exist here, and we therefore reject the contention.

9

charged Great-West Life with the duty of contracting with healthcare provider networks. For this proposition it relies on *Harris v. Superior Court* (1986) 188 Cal.App.3d 475 (*Harris*), where a doctor employed by a healthcare provider was subject to an arbitration provision in the provider's contract with a patient suing for malpractice. The *Harris* court held the doctor was subject to that provision based on the employer-employee relationship with the signatory healthcare provider and as a third party beneficiary of the agreement, which provided him with patients. *Harris* was distinguished in *Hollister v. Benzl* (1999) 71 Cal.App.4th 582, 587, where the physician was not an employee of the healthcare plan, but was instead an independent contractor of a medical group that was an independent contractor that contracted with the plan to provide services to members.

Our situation is more like *Hollister*. The City had no contractual or other relationship with Great-West Healthcare. Instead it contracted with Great-West Life, which in turn contracted with Great-West Healthcare to provide services to City employees.[5] In this regard, the situation is not unlike that of a buyer who intends to resell goods to a third party. In such cases, the buyer's eventual customers are not third party beneficiaries of the buyer's contract with the seller. (*Eastern Aviation Group, Inc. v. Airborne Express, Inc.* (1992) 6 Cal.App.4th 1448, 1453, citing *Corrugated Paper Products v. Longview Fibre Co.* (7th Cir. 1989) 868 F.2d 908, 912.)

### B. There Was No Preexisting Relationship

Many preexisting relationship cases involve medical malpractice claims by family members of a malpractice victim who signed a health care agreement that contained an arbitration provision. (*Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 607-608 [minor child bound by parents' consent to arbitration provision in medical treatment form]; *Herbert v. Superior Court* (1985) 169 Cal.App.3d 718, 720 [adult heirs bringing medical malpractice wrongful death action bound by arbitration provision in health care plan];

---

[5] We assume that some contractual relationship existed between Great-West Healthcare and Great-West Life that allowed the latter to gain access to the former's provider networks.

*Hawkins v. Superior Court* (1979) 89 Cal.App.3d 413, 419 [husband's signature on health care contract bound wife to arbitration provision].) Others involve agency relationships that require a nonsignatory employee to arbitrate claims because their employer had the authority to contract for medical services on their behalf and bind them to arbitration provisions in those contracts. (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 702-709.) The same reasoning has been applied to a physician-employee of a healthcare group that had an arbitration provision in its contracts with patients (*Harris, supra,* 188 Cal.App.3d at p. 477), and to the general partner of a limited partnership. (*Keller Construction Co. v. Kashani* (1990) 220 Cal.App.3d 222, 228-229.)

The common thread running through these cases is the existence of an agency or similar relationship between the nonsignatory and one of the parties to the arbitration agreement. This preexisting relationship supports the implied authority of the party to bind the nonsignatory. (*Matthau, supra,* 151 Cal.App.4th at pp. 599-600.)

The dispute in *Matthau* arose when the son of the late actor Walter Matthau refused to pay the actor's talent agency its 10 percent commission on residuals and profit participation payments that the actor's estate continued to receive. The talent agency brought a petition to compel both the son and a "loan out" company through which the actor provided his services to arbitrate pursuant to a provision in the late actor's contract with the agency. The trial court granted that petition and we issued a writ of mandate overturning the order in part because the son was not a party to the talent agency contract and because there was no preexisting relationship between the son and the late actor that gave the actor implied authority to bind the son to the arbitration provision. (*Matthau, supra,* 151 Cal.App.4th at p. 600.)

The facts here are similar. As the City points out in its appellate brief, there was no prior relationship between it and Great-West Healthcare, which was a signatory to the hospital services contract. Instead, the City was a party to the administrative services contract with Great-West Life. Promise's complaint refers to these as separate, albeit affiliated corporate entities. The contracts were signed by different persons who were president of their respective corporations. In short, although Great-West Healthcare and

11

Great-West Life share some degree of corporate consanguinity, they are entirely separate entities that entered separate contracts with separate entities. As a result, the City had no preexisting relationship with Great-West Healthcare.

C. Estoppel Based Solely on Participation in an Action Does Not Apply to Non-Signatory Defendants

The third exception recognized by the California courts is borrowed from federal law. The court in *Metalclad Corp. v. Ventana Environmental Organizational Partnership* (2003) 109 Cal.App.4th 1705, 1714-1716 (*Metalclad*) held as an issue of first impression that estoppel also applies when a plaintiff who is a party to a contract with an arbitration provision sues nonsignatories but asserts claims that are based on or intertwined with the plaintiff's contractual rights. In such cases, a nonsignatory defendant may compel the plaintiff to arbitrate his claims. (Accord *Boucher v. Alliance Title Co., Inc.* (2005) 127 Cal.App.4th 262, 268-272 (*Boucher*).) That doctrine was later extended to compel arbitration against nonsignatory plaintiffs who assert rights under a contract that contains an arbitration provision. (*JSM Tuscany, LLC v. Superior Court, supra,* 193 Cal.App.4th at pp. 1239-1240.)[6]

Promise contends this same principle applies here.[7] However no California appellate court has held that this theory of estoppel applies to bind a *defendant* to arbitrate pursuant to a contract he did not sign in the absence of a preexisting relationship or conduct that would otherwise lead to an inequitable result. The same is true of the

---

[6]     *Boucher* and *Metalclad* were decided before *Arthur Andersen LLP v. Carlisle, supra,* 556 U.S. 624 clarified that state and not federal law determined the issue of whether nonsignatories could be compelled to arbitrate. In that respect, decisions pre-dating *Arthur Andersen* may no longer be good law to the extent they relied on federal law as direct authority in this area.

[7]     Promise cites *Harris, supra,* 188 Cal.App.3d 475 to support this proposition. The *Harris* court applied principles of agency and contract law to bind a nonsignatory defendant physician to the terms of his employer's arbitration agreement. (*Id.* at pp. 478-479.) It never mentioned estoppel and is therefore inapplicable to this issue.

12

several federal decisions our courts have relied upon when invoking this theory of estoppel. Promise asks us to apply these decisions here because their holdings were not expressly limited to plaintiffs. However, the language of an opinion must be construed in light of the facts of the particular case, an opinion's authority is no broader than its factual setting, and the parties cannot rely on a rule announced in a factually dissimilar case. (*Mendoza v. City of West Covina* (2012) 206 Cal.App.4th 702, 716.) As a result, the holdings of decisions such as *Metalclad* and *Boucher* are limited to the circumstances at issue there, where nonsignatory defendants were allowed to assert estoppel and compel the plaintiffs to arbitrate causes of action that arose from the contracts they had signed.

Furthermore, as the City points out, equitable estoppel is called into play to do equity. Before an equitable estoppel can be applied, there must be an inequity to be remedied. (*Waffer Internat. Corp. v. Khorsandi* (1999) 69 Cal.App.4th 1261, 1279.) While there may be circumstances where a nonsignatory defendant has acted in a way that would bind him to an arbitration provision he did not sign, we see no such evidence applicable to this theory here.[8]

3.      *"Direct Benefits" Estoppel Is Not Applicable*

Promise also contends that the City is estopped from avoiding arbitration under the hospital services agreement because it accepted the benefits of that agreement in the form of access to health care for its employees at a reduced rate. It derives this principle from *American Bureau of Shipping v. Tencara Shipyard S.P.A.* (2d Cir. 1999) 170 F.3d 349, 352-353 (*American Bureau*).

---

[8]      To clarify, we hold that a defendant who was not a party to a contract with an arbitration provision may not be compelled to arbitrate the claim of a signatory plaintiff based solely on the fact that the plaintiff alleges a claim against the defendant. We do not exclude the possibility that a nonsignatory defendant may be compelled to arbitrate where certain conduct by the defendant apart from his mere status as someone against whom a claim is brought would make it inequitable to permit the defendant to avoid arbitration and require the plaintiff to sue in court.

13

In *American Bureau*, the court considered whether shipowners who sued the agency that issued a seaworthiness certificate for their craft were bound by an arbitration provision in the contract between the agency and the shipbuilder. The owners required the shipyard to obtain that certificate from the agency. After the ship was completed, the agency delivered to the shipyard an interim certificate containing the arbitration provision, and the shipyard in turn gave the certificate to the owners. The ship sank soon after, and the owners sued the agency in France while the shipyard sued it in Italy. The agency sued in a New York federal district court and promptly sought an order compelling the owners and shipyard to arbitrate pursuant to the terms of the seaworthiness certificate. The district court denied that motion, but the Second Circuit reversed, holding that the owners were bound by the arbitration provision because they received two direct benefits from the issuance of the seaworthiness certificate – lower insurance rates and the right to sail under the French flag. (*Id.* at p. 353.)

We reject Promise's reliance on *American Bureau* for several reasons. First, California law governs this issue and no California decision has extended the estoppel doctrine this far.[9]

Second, although technically the agency in *American Bureau* was the plaintiff because it brought the federal court action, it did so in order to compel arbitration *after* being sued by the owners and shipyard. Therefore the *American Bureau* decision is grounded in a factual setting similar to the other decisions we have cited, where a defendant is able to compel a nonsignatory plaintiff to arbitrate his dispute arising from a contract with an arbitration provision. (Accord *Bridas S.A.P.I.C. v. Government of Turkmenistan* (5th Cir. 2003) 345 F.3d 347, 362.)

---

[9] Promise incorrectly contends that *Boucher, supra,* 127 Cal.App.4th 262 endorsed the direct benefits estoppel line of cases. Instead, *Boucher,* which involved estoppel by defendants against signatory plaintiffs, simply noted the existence of those decisions as an aspect of federal law in this area. (*Id.* at p. 269.) Also, the factual predicate of this theory – being bound to arbitrate by receiving direct benefits from a contract – strikes us as something better analyzed under the third party beneficiary doctrine.

Third, we do not believe that the City received direct benefits from the healthcare services agreement between Promise and Great-West Healthcare. The court in *Zurich American Ins. Co. v. Watts Industries, Inc.* (7th Cir. 2005) 417 F.3d 682, affirmed a federal district court order denying an insurance company's motion to compel the Jones company to arbitrate a dispute arising from the insurer's failure to defend a lawsuit brought against Jones. Jones was a subsidiary of another company and was one of the named insureds in the policy, which it did not sign and which did not include an arbitration provision. The parent company, but not Jones, also signed deductible agreements that did contain an arbitration provision. The Seventh Circuit rejected the insurer's contention that Jones received a direct benefit from the deductible agreement by way of lower insurance premiums. The court noted that Jones did not try to enforce any rights under the deductible agreement, and in fact had none. Any lower insurance premiums it received from that agreement were "too attenuated and indirect to force arbitration under an estoppel theory." (*Id.* at p. 688.)

Unlike the ship owners in *American Bureau, supra,* who asked the shipyard to obtain the seaworthiness certificate specifically in order to benefit them as owners, the City did nothing more than contract with Great-West Life to administer its employee health care plan and procure a network of healthcare providers to service the City's covered employees. Great-West Life fulfilled its duties under that administrative services contract pursuant to a preexisting hospital services contract between two separate entities – Great-West Healthcare and Promise. We recognize that in some sense the hospital services contract provided a benefit to the City, but nothing in the record shows that the City ever asserted rights under the healthcare services agreement or otherwise tried to exploit it. Instead, it was Great-West Healthcare which had the right to enforce that agreement. What benefits flowed to the City as a result were too attenuated to be considered direct.

Further, the direct benefits estoppel theory requires proof that the party to be estopped in fact knew of the contract to which it will be bound. (*Noble Drilling Servs. v. Certex USA, Inc.* (5th Cir. 2010) 620 F.3d 469, 473.) The City's human resources

15

director submitted a declaration that the City was never told about the health services contract, or that there were provider contracts containing arbitration provisions. This undisputed evidence, which the trial court at least implicitly found credible, shows that the City did not know about the preexisting healthcare services contract, making direct benefits estoppel inapplicable. (*Id.* at pp. 473-474.)

4.      *No Agency Relationship Existed to Bind the City to Arbitrate*

Promise contends that the City is bound to the arbitration provision in the healthcare services agreement under principles of agency law. As previously discussed, Great-West Healthcare, not Great-West Life, was the other party to the Promise's contract, and the City had no relationship of any kind with Great-West Healthcare. Promise contends that Great-West Life had the authority to bind the City to the terms of the healthcare services agreement because the administrative services contract gave it the power to negotiate contracts with provider networks, allowed it to use reasonable care when doing so, and stated that the City had obligations that arose from provider contracts that were not inconsistent with the administrative services contract.

We disagree. First, at issue here is a contract that existed before the administrative services contract came into being. If an agency relationship between the City and Great-West Life ever existed, it could not have been at that time. Second, the City expressly limited Great-West Life's ability to act on its behalf. The administrative services contract said that except for claim appeals, Great-West Life performed only non-discretionary, ministerial functions within guidelines set by the City. Great-West Life had no power, discretion, or authority to bind the City or waive any of its rights through any statements Great-West Life made or by its receipt of any notice or information. Great-West Life had no power, discretion, or authority to act on the City's behalf other than as expressly granted in the contract. The contract does not grant Great-West Life the power to waive the City's right to resolve disputes in court, and made no mention of preexisting contracts for access to provider networks.

16

As for the clause concerning the City's obligations in provider contracts, those were limited to obligations that were not inconsistent with the terms of the administrative services contract. That clause was illustrated by one example only: the obligation to pay for all covered services rendered. Such a provision was part of both the hospital services and administrative services contracts, but the latter says nothing about arbitration. In fact, when the administrative services contract mentioned the City's liability to proviers, it referred to causes of action, not arbitration. Therefore, any attempt to graft a duty to arbitrate on this provision must fail because it would not be consistent with the terms of the administrative services contract.

## DISPOSITION

The order denying Promise Hospital's petition to compel the City of Long Beach to arbitrate is affirmed. The City shall recover its appellate costs.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

17